# Exhibit 1



XL Insurance





June 1, 2023

Aon Risk Services Central, Inc.
200 East Randolph Street
Chicago, IL 60601

505 Eagleview Blvd.
Suite 100
Exton, Pa 19341-1120
USA

Phone  +1 800 327 1414
Fax     +1 610 458 8667
axaxl.com

Tradebe Environmental Services, LLC/ US00128761PR23A/Indian Harbor Insurance Company

Dear Melissa,

We are pleased to enclose the renewal policy for the above Named Insured. Please review it carefully and advise our office of any necessary changes or questions you may have.

Please note that the Policyholder Notices attached to this letter must be included when forwarding the policy(ies) to the Insured.

If this is a Surplus Lines Policy, please fulfill your tax payment responsibilities on behalf of the Insured.

This(These) policy(ies) is(are) part of a Global Property Program, and it is(they are) serviced by AXA XL US Incoming Property Team.

We thank you for being a valued business partner.

Sincerely,

Chief Executive, Americas
Incoming/Reverse Flow Casualty Unit
joseph.tocco@axaxl.com

*AXA, the AXA and XL logos are trademarks of AXA SA or its affiliates. AXA XL is a division of AXA Group providing products and services through four business groups: AXA XL Insurance, AXA XL Reinsurance, AXA XL Art & Lifestyle and AXA XL Risk Consulting.*

*© 2018 X.L. America, Inc.*
RS

## NOTICE TO POLICYHOLDERS

**INDIANA - NOTICE**

**Questions regarding your policy or coverage should be directed to:**

AXA XL
SEAVIEW HOUSE
70 SEAVIEW AVENUE
STAMFORD, CT  06902-6040
800-622-7311

If you (a) need the assistance of the governmental agency that regulates insurance; or (b) have a complaint you have been unable to resolve with your insurer you may contact the Department of Insurance by mail, telephone or email:

State of Indiana Department of Insurance
Consumer Services Division
311 West Washington Street, Suite 300
Indianapolis, Indiana 46204

Consumer Hotline: (800) 622-4461; (317) 232-2395

Complaints can be filed electronically at www.in.gov/idoi

## NOTICE TO POLICYHOLDERS

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Policyholder Notice provides information concerning possible impact on your insurance coverage due to the impact of U.S. Trade Sanctions[1]. Please read this Policyholder Notice carefully.

In accordance with the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") regulations, or any other U.S. Trade Sanctions embargoes or export controls applied by any regulatory body, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions, embargoes or export controls law, is a Specially Designated National and Blocked Person ("SDN"), or is owned or controlled by an SDN, this insurance will be considered a blocked or frozen contract. When an insurance policy is considered to be such a blocked or frozen contract, neither payments nor premium refunds may be made without authorization from OFAC or the applicable regulator. Other limitations on the premiums and payments also apply.

[1] "U.S Trade Sanctions" may be promulgated by Executive Order, act of Congress, regulations from the U.S. Departments of State, Treasury, or Commerce, regulations from the State Insurance Departments, etc.

PN CW 05 0519

©2019 X.L. America, Inc. All rights reserved. May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

## NOTICE TO POLICYHOLDERS

**PRODUCER COMPENSATION NOTICE**

Dear Policyholder:

On the declaration page of your insurance policy you will find important information about your insurance coverage, including the policy premium. AXA XL believes that it is important for policyholders to know that the insurance premium you pay for this policy includes not only the cost for the insurance provided by AXA XL but it may also include the compensation we may pay to the insurance producer who has arranged for the placement of your insurance with AXA XL.

We at AXA XL are committed to full transparency concerning the amount of premium allocated to insurance producer compensation. In the event that you have a question about the amount of compensation paid to the insurance producer for your insurance policy, we encourage you to contact your insurance producer.

Thank you for insuring with AXA XL.

PN CW 03 0119                                                                                    Page 1 of 1

© 2019 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

## NOTICE TO POLICYHOLDERS

### PRIVACY POLICY

The AXA XL insurance group (the "Companies"), believes personal information that we collect about our customers, potential customers, and proposed insureds (referred to collectively in this Privacy Policy as "customers") must be treated with the highest degree of confidentiality. For this reason and in compliance with the Title V of the Gramm-Leach-Bliley Act ("GLBA"), we have developed a Privacy Policy that applies to all of our companies. For purposes of our Privacy Policy, the term "personal information" includes all information we obtain about a customer and maintain in a personally identifiable way. In order to assure the confidentiality of the personal information we collect and in order to comply with applicable laws, all individuals with access to personal information about our customers are required to follow this policy.

### Our Privacy Promise

Your privacy and the confidentiality of your business records are important to us. Information and the analysis of information is essential to the business of insurance and critical to our ability to provide to you excellent, cost-effective service and products. We understand that gaining and keeping your trust depends upon the security and integrity of our records concerning you. Accordingly, we promise that:

1. We will follow strict standards of security and confidentiality to protect any information you share with us or information that we receive about you;
2. We will verify and exchange information regarding your credit and financial status only for the purposes of underwriting, policy administration, or risk management and only with reputable references and clearinghouse services;
3. We will not collect and use information about you and your business other than the minimum amount of information necessary to advise you about and deliver to you excellent service and products and to administer our business;
4. We will train our employees to handle information about you or your business in a secure and confidential manner and only permit employees authorized to use such information to have access to such information;
5. We will not disclose information about you or your business to any organization outside the AXA XL insurance group of Companies or to third party service providers unless we disclose to you our intent to do so or we are required to do so by law;
6. We will not disclose medical information about you, your employees, or any claimants under any policy of insurance, unless you provide us with written authorization to do so, or unless the disclosure is for any specific business exception provided in the law;
7. We will attempt, with your help, to keep our records regarding you and your business complete and accurate, and will advise you how and where to access your account information (unless prohibited by law), and will advise you how to correct errors or make changes to that information; and
8. We will audit and assess our operations, personnel and third party service providers to assure that your privacy is respected.

### Collection and Sources of Information

We collect from a customer or potential customer only the personal information that is necessary for (a) determining eligibility for the product or service sought by the customer, (b) administering the product or service obtained, and (c) advising the customer about our products and services. The information we collect generally comes from the following sources:

- Submission – During the submission process, you provide us with information about you and your business, such as your name, address, phone number, e-mail address, and other types of personal identification information;
- Quotes – We collect information to enable us to determine your eligibility for the particular insurance product and to determine the cost of such insurance to you. The information we collect will vary with the type of insurance you seek;

PN CW 02 0119 

Page 1 of 3

© 2019 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

- Transactions – We will maintain records of all transactions with us, our affiliates, and our third party service providers, including your insurance coverage selections, premiums, billing and payment information, claims history, and other information related to your account;
- Claims – If you obtain insurance from us, we will maintain records related to any claims that may be made under your policies. The investigation of a claim necessarily involves collection of a broad range of information about many issues, some of which does not directly involve you. We will share with you any facts that we collect about your claim unless we are prohibited by law from doing so. The process of claim investigation, evaluation, and settlement also involves, however, the collection of advice, opinions, and comments from many people, including attorneys and experts, to aid the claim specialist in determining how best to handle your claim. In order to protect the legal and transactional confidentiality and privileges associated with such opinions, comments and advice, we will not disclose this information to you; and
- Credit and Financial Reports – We may receive information about you and your business regarding your credit. We use this information to verify information you provide during the submission and quote processes and to help underwrite and provide to you the most accurate and cost-effective insurance quote we can provide.

### Retention and Correction of Personal Information

We retain personal information only as long as required by our business practices and applicable law. If we become aware that an item of personal information may be materially inaccurate, we will make reasonable effort to re-verify its accuracy and correct any error as appropriate.

### Storage of Personal Information

We have in place safeguards to protect data and paper files containing personal information.

### Sharing/Disclosing of Personal Information

We maintain procedures to assure that we do not share personal information with an unaffiliated third party for marketing purposes unless such sharing is permitted by law. Personal information may be disclosed to an unaffiliated third party for necessary servicing of the product or service or for other normal business transactions as permitted by law.

We do not disclose personal information to an unaffiliated third party for servicing purposes or joint marketing purposes unless a contract containing a confidentiality/non-disclosure provision has been signed by us and the third party. Unless a consumer consents, we do not disclose "consumer credit report" type information obtained from an application or a credit report regarding a customer who applies for a financial product to any unaffiliated third party for the purpose of serving as a factor in establishing a consumer's eligibility for credit, insurance or employment. "Consumer credit report type information" means such things as net worth, credit worthiness, lifestyle information (piloting, skydiving, etc.) solvency, etc. We also do not disclose to any unaffiliated third party a policy or account number for use in marketing. We may share with our affiliated companies information that relates to our experience and transactions with the customer.

### Policy for Personal Information Relating to Nonpublic Personal Health Information

We do not disclose nonpublic personal health information about a customer unless an authorization is obtained from the customer whose nonpublic personal information is sought to be disclosed. However, an authorization shall not be prohibited, restricted or required for the disclosure of certain insurance functions, including, but not limited to, claims administration, claims adjustment and management, detection, investigation or reporting of actual or potential fraud, misrepresentation or criminal activity, underwriting, policy placement or issuance, loss control and/or auditing.

© 2019 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

## NOTICE TO POLICYHOLDERS

Access to Your Information

Our employees, employees of our affiliated companies, and third party service providers will have access to information we collect about you and your business as is necessary to effect transactions with you. We may also disclose information about you to the following categories of person or entities:

- Your independent insurance agent or broker;
- An independent claim adjuster or investigator, or an attorney or expert involved in the claim;
- Persons or organizations that conduct scientific studies, including actuaries and accountants;
- An insurance support organization;
- Another insurer if to prevent fraud or to properly underwrite a risk;
- A state insurance department or other governmental agency, if required by federal, state or local laws; or
- Any persons entitled to receive information as ordered by a summons, court order, search warrant, or subpoena.

Violation of the Privacy Policy

Any person violating the Privacy Policy will be subject to discipline, up to and including termination.


For more information or to address questions regarding this privacy statement, please contact your broker.

© 2019 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

**FRAUD NOTICE**

| Alabama | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof. |
|---|---|
| Arkansas | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| California | For your protection California law requires the following to appear on this form: Any person who knowingly presents false or fraudulent information to obtain or amend insurance coverage or to make a claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison. |
| Colorado | **It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.** |
| District of Columbia | **WARNING:** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant. |
| Florida | Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree. |
| Kansas | A "fraudulent insurance act" means an act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance that such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto. |
| Kentucky | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime. |
| Louisiana | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| Maine | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines, or denial of insurance benefits. |
| Maryland | Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| New Jersey | Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties. |

© 2023 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

| New Mexico | ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES. |
|---|---|
| New York | **General: All applications for commercial insurance, other than automobile insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**All applications for automobile insurance and all claim forms:** Any person who knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the value of the subject motor vehicle or stated claim for each violation.

**Fire:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

The proposed insured affirms that the foregoing information is true and agrees that these applications shall constitute a part of any policy issued whether attached or not and that any willful concealment or misrepresentation of a material fact or circumstances shall be grounds to rescind the insurance policy. |
| Ohio | Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud. |
| Oklahoma | **WARNING**: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**WARNING**: **All Workers Compensation Insurance**:
Any person or entity who makes any material false statement or representation, who willfully and knowingly omits or conceals any material information, or who employs any device, scheme, or artifice, or who aids and abets any person for the purpose of:
1. obtaining any benefit or payment,
2. increasing any claim for benefit or payment, or
3. obtaining workers' compensation coverage under the Administrative Workers' Compensation Act, shall be guilty of a felony punishable pursuant to Section 1663 of Title 21 of the Oklahoma Statutes. |

© 2023 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

| Pennsylvania | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.<br><br>**Automobile Insurance:** Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and the payment of a fine of up to $15,000. |
|---|---|
| Puerto Rico | **Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances [be] present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.** |
| Rhode Island | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| Tennessee | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.<br><br>**Workers' Compensation:** It is a crime to knowingly provide false, incomplete or misleading information to any party to a workers' compensation transaction for the purpose of committing fraud. Penalties include imprisonment, fines and denial of insurance benefits. |
| Utah | **Workers' Compensation:** Any person who knowingly presents false or fraudulent underwriting information, files or causes to be filed a false or fraudulent claim for disability compensation or medical benefits, or submits a false or fraudulent report or billing for health care fees or other professional services is guilty of a crime and may be subject to fines and confinement in state prison. |
| Virginia | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| Washington | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| West Virginia | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| All Other States | Any person who knowingly and willfully presents false information in an application for insurance may be guilty of insurance fraud and subject to fines and confinement in prison. (In Oregon, the aforementioned actions may constitute a fraudulent insurance act which may be a crime and may subject the person to penalties). |

© 2023 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

## NOTICE TO POLICYHOLDERS

# PROPERTY CLAIMS LOSS NOTIFICATION

AXA XL has built a reputation for resolving property claims efficiently and fairly.  To deliver our world-class service and respond to our clients business needs in a timely manner, please contact our property claims specialists.

**For immediate service in the event of a loss:**

Loss notification can be made as follows:
Email    napropcasclaimnewnotices@axaxl.com
Fax      (866) 740-6067
Phone   (800) 688-1840 (during and after business hours)

We hope you never have to use this information.  In the event you do, however, you can expect AXA XL exceptional claims specialists to be ready to respond.

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.





# COMMERCIAL PROPERTY INSURANCE POLICY DECLARATIONS

| COMPANY PROVIDING COVERAGE | REGULATORY OFFICE |
|---|---|
| **Indian Harbor Insurance Company** <br> (Hereinafter referred to as the Company) | Dept: Regulatory <br> 505 Eagleview Blvd., Suite 100 <br> Exton, PA 19341-1120 <br> Telephone: 800-688-1840 |

POLICY NUMBER:  US00128761PR23A     RENEWAL OF NUMBER:   US00098497PR22A

POLICY PERIOD:   FROM:  April 1, 2023     TO:  December 31, 2023

    Beginning and ending at 12:01 am at the "location" of property involved in any claims.

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL TERMS OF THIS POLICY, THE COMPANY AGREES TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY TO:

NAMED INSURED AND MAILING ADDRESS:  **Tradebe Environmental Services, LLC**
(Refer to policy for complete title)
1433 E. 83rd Avenue
Merrilville, IN 46410

NATURE OF OPERATION:  Refuse Systems

PRODUCER AND MAILING ADDRESS:  Aon Risk Services Central, Inc.
200 East Randolph Street
Chicago, IL 60601

| | |
|---|---:|
| PREMIUM: | **$ 285,274.00** |
|    Premium for Certified Acts of Terrorism | **EXCLUDED** |
| **Total Amount Due:** | **$ 285,274.00** |

Form(s) and Endorsement(s) made a part of this policy at time of issuance:

   Endorsement No.1 - Exclusion of Certified Acts of Terrorism Endorsement

   Endorsement No.2 - Participation Endorsement

   Endorsement No.3 - Indiana Amendatory Endorsement

   Endorsement No.4 - Service of Process

Joseph Tocco, President

PSP DEC 0419     © 2019 X.L. America, Inc.  All Rights Reserved.     Page 1 of 1
May not be copied without permission.

# IN WITNESS

## INDIAN HARBOR INSURANCE COMPANY

REGULATORY OFFICE
505 EAGLEVIEW BOULEVARD, SUITE 100
DEPARTMENT:  REGULATORY
EXTON, PA  19341-1120
PHONE:  800-688-1840

It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.

All other provisions remain unchanged.

IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

Joseph A. Tocco
President

Toni Ann Perkins
Secretary

IL MP 9104 0314 IHIC

©2014 X.L. America, Inc.  All rights reserved.  May not be copied without permission.

POLICY NUMBER: US00128761PR23A

# COMMERCIAL PROPERTY INSURANCE POLICY
## TABLE OF CONTENTS

| | | |
|---|---|---|
| **SECTION I. POLICY DECLARATIONS** | | **4** |
| A. | NAMED INSURED: | 4 |
| B. | MAILING ADDRESS | 4 |
| C. | POLICY PERIOD | 4 |
| D. | PREMIUM | 4 |
| E. | POLICY TERRITORY | 4 |
| F. | CURRENCY | 4 |
| G. | LIMITS OF LIABILITY | 4 |
| H. | TIME LIMITS | 8 |
| I. | WAITING PERIODS | 9 |
| J. | DEDUCTIBLES | 9 |
| **SECTION II. PROPERTY DAMAGE** | | **11** |
| A. | INSURING AGREEMENT | 11 |
| B. | INSURED PROPERTY | 11 |
| C. | EXCLUDED PROPERTY | 11 |
| D. | EXCLUSIONS | 12 |
| E. | PROPERTY DAMAGE COVERAGE EXTENSIONS AND ADDITIONAL CONDITIONS | 16 |
| | 1. ACCOUNTS RECEIVABLE | 17 |
| | 2. BRANDS AND LABELS | 17 |
| | 3. CONSEQUENTIAL REDUCTION IN VALUE | 18 |
| | 4. CONTROL OF DAMAGED PROPERTY | 18 |
| | 5. COURSE OF CONSTRUCTION | 18 |
| | 6. DEBRIS REMOVAL | 18 |
| | 7. DECONTAMINATION COSTS | 19 |
| | 8. DEFERRED PAYMENTS | 19 |
| | 9. DEMOLITION AND INCREASED COST OF CONSTRUCTION | 19 |
| | 10. ELECTRONIC DATA PROCESSING EQUIPMENT AND ELECTRONIC DATA | 20 |
| | 11. ERRORS AND OMISSIONS | 21 |
| | 12. EXPEDITING COSTS | 21 |
| | 13. FINE ARTS | 21 |
| | 14. FIRE DEPARTMENT SERVICE CHARGES | 21 |
| | 15. LAND AND WATER CONTAMINANT OR POLLUTANT CLEANUP, REMOVAL AND DISPOSAL | 22 |
| | 16. MISCELLANEOUS UNNAMED LOCATIONS | 22 |
| | 17. NEWLY ACQUIRED LOCATIONS | 22 |
| | 18. PROFESSIONAL FEES | 23 |
| | 19. PROTECTION AND PRESERVATION OF PROPERTY | 23 |
| | 20. SERVICE INTERRUPTION – PROPERTY DAMAGE | 23 |
| | 21. RADIOACTIVE DECONTAMINATION | 23 |
| | 22. TAX TREATMENT OF PROFITS | 24 |

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

| | 23. | **TEMPORARY REMOVAL OF PROPERTY** | 24 |
|---|---|---|---|
| | 24. | **TRANSPORTATION** | 24 |
| | 25. | **VACANCY** | 25 |
| | 26. | **VALUABLE PAPERS AND RECORDS** | 25 |
| **SECTION III. TIME ELEMENT** | | | **26** |
| **A.** | | **LOSS INSURED** | **26** |
| **B.** | | **TIME ELEMENT EXCLUSIONS** | **26** |
| **C.** | | **TIME ELEMENT COVERAGES** | **27** |
| | 1. | **GROSS EARNINGS** | 27 |
| | 2. | **GROSS PROFITS** | 28 |
| | 3. | **EXTRA EXPENSE** | 29 |
| | 4. | **COMMISSIONS, PROFITS AND ROYALTIES** | 29 |
| | 5. | **LEASEHOLD INTEREST** | 29 |
| | 6. | **RENTAL INSURANCE** | 30 |
| | 7. | **TIME ELEMENT INTERDEPENDENCY** | 30 |
| **D.** | | **TIME ELEMENT COVERAGE EXTENSIONS** | **30** |
| | 1. | **CIVIL OR MILITARY AUTHORITY** | 30 |
| | 2. | **CONTINGENT TIME ELEMENT** | 31 |
| | 3. | **EXTENDED PERIOD OF INDEMNITY** | 31 |
| | 4. | **IMPOUNDED WATER** | 31 |
| | 5. | **INGRESS/EGRESS** | 32 |
| | 6. | **PROTECTION AND PRESERVATION OF PROPERTY – TIME ELEMENT** | 32 |
| | 7. | **RESEARCH AND DEVELOPMENT** | 32 |
| | 8. | **SERVICE INTERRUPTION – TIME ELEMENT** | 33 |
| | 9. | **SOFT COSTS** | 33 |
| **E.** | | **PERIOD OF INDEMNITY** | **33** |
| **F.** | | **SCHEDULE OF CONTINGENT TIME ELEMENT LOCATIONS** | **36** |
| **SECTION IV. EQUIPMENT BREAKDOWN COVERAGE EXTENSION** | | | **37** |
| **SECTION V. LOSS ADJUSTMENT AND SETTLEMENT** | | | **39** |
| **A.** | | **LOSS ADJUSTMENT AND LOSS PAYABLE** | **39** |
| **B.** | | **LOSS CONDITIONS** | **39** |
| | 1. | **ABANDONMENT** | 39 |
| | 2. | **APPRAISAL** | 39 |
| | 3. | **ASSIGNMENT** | 39 |
| | 4. | **COLLECTION FROM OTHERS** | 39 |
| | 5. | **COMPANY OPTION** | 40 |
| | 6. | **CHOICE OF LAW** | 40 |
| | 7. | **PARTIAL PAYMENT OF LOSS SETTLEMENT** | 40 |
| | 8. | **REQUIREMENTS IN CASE OF LOSS** | 40 |
| | 9. | **SALVAGE AND RECOVERY** | 41 |
| | 10. | **SETTLEMENT OF CLAIMS** | 41 |
| | 11. | **SUBROGATION** | 41 |

| | 12. | SUIT AGAINST THE COMPANY | 41 |
|---|---|---|---|
| C. | | VALUATION | 42 |
| **SECTION VI. GENERAL CONDITIONS** | | | 44 |
| A. | | LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS | 44 |
| B. | | CERTIFICATES OF INSURANCE | 45 |
| C. | | CANCELLATION AND NON-RENEWAL | 45 |
| D. | | INSPECTIONS | 45 |
| E. | | LIBERALIZATION | 45 |
| F. | | MISREPRESENTATION AND FRAUD | 46 |
| G. | | OTHER INSURANCE | 46 |
| H. | | PROVISIONS APPLICABLE TO JURISDICTIONS | 46 |
| I. | | POLICY MODIFICATION | 46 |
| J. | | REDUCTION BY LOSS | 47 |
| K. | | SUSPENSION | 47 |
| L. | | TITLES | 47 |
| **SECTION VII. DEFINITIONS** | | | 48 |
| **APPENDIX FOR EARTH MOVEMENT ZONES** | | | 56 |

Each defined word or term used in this Policy is shown in quotation marks (ex. "defined term"). When used as a title or other use, quotation marks are not shown.

For example: the phrase ACCOUNTS RECEIVABLE, when displayed this way uses the term as a title. When displayed as "accounts receivable", the term is as it is defined in **SECTION VII. DEFINITIONS**.

POLICY NUMBER: US00128761PR23A

## SECTION I. POLICY DECLARATIONS

**A. NAMED INSURED:**

Tradebe Environmental Services, LLC

Hereafter referred to as the First Named Insured.

The following are all hereafter referred to as the Insured.

The First Named Insured and any subsidiary companies, corporations, firms or organizations in which the First Named Insured has management control or ownership, as now or may hereafter be constituted during the **POLICY PERIOD**, and any interest in a partnership or joint venture in which the aforementioned entities have more than fifty percent (50%) ownership interest or management control.

**B. MAILING ADDRESS**

1433 E. 83rd Avenue
Merrilville, IN 46410

**C. POLICY PERIOD**

From:   April 1, 2023

To:        December 31, 2023

Beginning and ending at 12:01 am at the "location" of property involved in any claims.

**D. PREMIUM**

This Policy is issued to the First Named Insured who is responsible for the payment of premium and any associated surcharges. Any return of the paid premium accruing under this Policy will be paid to the First Named Insured.

**E. POLICY TERRITORY**

This Policy covers insured property in the fifty (50) states comprising the United States of America, its territories and possessions, the Commonwealth of Puerto Rico and the District of Columbia.

**F. CURRENCY**

All amounts, including deductibles and limits of liability, indicated in the Policy are in the currency of the United States of America.

**G. LIMITS OF LIABILITY**

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

1. **POLICY LIMIT**

The Company's maximum limit of liability in an "occurrence", excess of deductible shall be as follows:

| Layer Excess of Deductibles | Layer Limit per "occurrence" | | Company Share | Company Capacity |
|---|---|---|---|---|
| **Primary** | $25,000,000 | | 60% | $15,000,000 |
| | | | **Total:** | $15,000,000 |

This amount is further limited by any applicable sublimits stated in Paragraph 2. **SUBLIMITS**, or in any endorsement made part of this contract.

For purposes of the overall Policy Limit, any recoverable income loss associated with **EQUIPMENT BREAKDOWN** is considered **TIME ELEMENT**, and any and all other recoverable amounts associated with **EQUIPMENT BREAKDOWN** are considered **PROPERTY DAMAGE**.

2. **SUBLIMITS**

   a. Sublimits are part of and not in addition to the Policy Limit. Sublimits do not increase the Policy Limit or any other sublimits.

   b. If a sublimit for a peril or type of coverage is shown as 'Aggregate', such sublimit shall apply in the aggregate to all such losses occurring during the **POLICY PERIOD**, regardless of the number of "location"(s), coverage(s), or "occurrence"(s) involved.

   c. If no sublimit is shown as the sublimit of any item listed below, then no separate sublimit applies for that item.

   d. No coverage is provided under this Policy for a peril or type of loss or damage if 'NCP' (No Coverage Provided) is shown as the sublimit.

   e. If not specifically stated below, a sublimit shall apply on a per "occurrence" basis to the total loss or damage at all Insured Location(s) and for all coverages involved, regardless of the number or type(s) of coverage(s) involved.

   f. If "flood" directly results from "earth movement", Windstorm, Hail or "named storm", the "flood" sublimit applies within, and shall also serve to erode, any sublimit for such peril.

   g. Certain coverages have more specific sublimits or exclusions when they arise as a result of "earth movement", "flood", Windstorm, Hail or "named storm" and, if applied to loss arising in connection with other perils, are subject to the overall sublimit for such coverages stated in the **SUBLIMITS** section of this Policy.

$10,000,000      "Earth movement", per occurrence, in the aggregate, except not to exceed the following which are a part of and not in addition to this "earth movement" limit:

         NCP          for all loss arising from direct physical damage in HIGH HAZARD EARTH MOVEMENT ZONES, per occurrence, in the aggregate, except not to exceed the following which are a part of and not in addition to this HIGH HAZARD EARTH MOVEMENT ZONE limit

                 NCP          for all loss arising from direct physical damage in the State of California

 © 2019 X.L. America, Inc. All Rights Reserved. May not be copied without permission.

POLICY NUMBER: US00128761PR23A

| | | |
|---|---|---|
| | NCP | for all loss arising from direct physical damage in the State of Hawaii |
| | NCP | for all loss arising from direct physical damage in the State of Alaska |
| | NCP | for all loss arising from direct physical damage in Puerto Rico |
| | NCP | for all loss arising from direct physical damage in PACIFIC NORTHWEST SEISMIC ZONE |

| | | |
|---|---|---|
| $10,000,000 | | for all loss arising from direct physical damage in MODERATE HAZARD EARTH MOVEMENT ZONE, per occurrence, in the aggregate |
| | $10,000,000 | for all loss arising from direct physical damage in NEW MADRID SEISMIC ZONE |

| | | |
|---|---|---|
| $10,000,000 | | "Flood", per occurrence, in the aggregate, except not to exceed the following which are a part of and not in addition to this "flood" limit: |
| | NCP | for all loss arising from direct physical damage in "high hazard flood zones", per occurrence, in the aggregate |
| | $10,000,000 | for all loss arising from direct physical damage in "moderate hazard flood zones", per occurrence, in the aggregate |
| Included | | Windstorm, Hail not associated with a "named storm" |
| $10,000,000 | | "Named storm", per occurrence, in the aggregate, except not to exceed the following which are part of and not in addition to this "named storm" limit: |
| | $10,000,000 | for all loss arising from direct physical damage in HIGH HAZARD WIND ZONE, per occurrence, in the aggregate |
| | $10,000,000 | for all loss arising from direct physical damage in MODERATE HAZARD WIND ZONE, per occurrence, in the aggregate |
| $25,000,000 | | All other perils insured by this Policy but not specified above |
| NCP | | **ACCOUNTS RECEIVABLE** |
| NCP | | **BRANDS AND LABELS** |
| NCP | | **CONSEQUENTIAL REDUCTION IN VALUE** |
| NCP | | **CONTROL OF DAMAGED PROPERTY** |
| $1,000,000 | | **COURSE OF CONSTRUCTION** |
| $5,000,000 | | **DEBRIS REMOVAL,** or 25% of PD loss, whichever is less |
| NCP | | **DECONTAMINATION COSTS** |

 © 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

POLICY NUMBER: US00128761PR23A

| | |
|---|---|
| NCP | **DEFERRED PAYMENTS** |
| $500,000 | **DEMOLITION AND INCREASED COST OF CONSTRUCTION** |
| $150,000 | **ELECTRONIC DATA PROCESSING EQUIPMENT AND ELECTRONIC DATA** |
| NCP | **ERRORS AND OMISSIONS** |
| NCP | **EQUIPMENT BREAKDOWN**, except not to exceed the following which are part of and not in addition to this **EQUIPMENT BREAKDOWN** limit: |

| | | |
|---|---|---|
| | NCP | Ammonia contamination |
| | NCP | Expediting expense |
| | NCP | Hazardous substances |
| | NCP | Spoilage |
| | NCP | Water damage |

| | |
|---|---|
| NCP | **EXPEDITING COSTS** |
| NCP | **FINE ARTS**, except not to exceed $10,000 per item |
| $5,000,000 | **FIRE DEPARTMENT SERVICE CHARGES** |
| NCP | **LAND AND WATER CONTAMINANT OR POLLUTANT CLEANUP, REMOVAL AND DISPOSAL** |
| $1,000,000 | **MISCELLANEOUS UNNAMED LOCATIONS**(up to $10,000,000 excluding Earth Movement, Flood and Named Storm) |
| $1,800,000 | **NEWLY ACQUIRED LOCATIONS**(up to $50,000,000, 90 days reporting, excluding CRITICAL Earth Movement, Flood & Named Storm) |
| NCP | Outdoor Property |
| $50,000 | **PROFESSIONAL FEES** |
| $25,000 | **PROTECTION AND PRESERVATION OF PROPERTY** |
| NCP | **SERVICE INTERRUPTION – PROPERTY DAMAGE** |
| NCP | **RADIOACTIVE DECONTAMINATION** |
| NCP | **TRANSPORTATION** |
| NCP | **TAX TREATMENT OF PROFITS** |
| NCP | **TEMPORARY REMOVAL OF PROPERTY** |
| NCP | **VACANCY** |
| $25,000 | **VALUABLE PAPERS AND RECORDS** |
| NCP | **GROSS EARNINGS** |
| $25,000,000 | **GROSS PROFITS** |
| NCP | **EXTRA EXPENSE** |
| NCP | **COMMISSIONS, PROFITS AND ROYALTIES** |

 © 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

POLICY NUMBER: US00128761PR23A

| NCP | **LEASEHOLD INTEREST** |
|---|---|
| NCP | **RENTAL INSURANCE** |
| NCP | **TIME ELEMENT INTERDEPENDENCY** |
| NCP | **CIVIL OR MILITARY AUTHORITY**, subject to a distance limitation of one (1) mile from a covered "location" involved in the loss or damage. (up to $10,000,000, up to 1 mile, subject to a maximum of 30 consecutive days, 48 hours waiting period) |
| NCP | **CONTINGENT TIME ELEMENT** at location(s) shown on the schedule attached to this Policy, (at scheduled locations up to $20,000,000. CAT Coverage applies only if modeled in the MOF up to $20,000,000). |
| $1,500,000 | **CONTINGENT TIME ELEMENT** at unscheduled properties; (up to $5,000,000, excluding rxcluding Earth Movement, Flood and Named Storm.) |
| NCP | **IMPOUNDED WATER** |
| $1,500,000 | **INGRESS/EGRESS**, subject to a distance limitation of one (1) mile from a covered "location" involved in the loss or damage. (up to $10,000,000, up to 1 mile, subject to a maximum of 30 consecutive days, 48 hours waiting period) |
| NCP | **PROTECTION AND PRESERVATION OF PROPERTY – TIME ELEMENT** |
| NCP | **RESEARCH AND DEVELOPMENT** |
| $1,500,000 | **SERVICE INTERRUPTION – TIME ELEMENT**(up to $10,000,000 per occurrence subject to a waiting period of 72 hours) |
| NCP | **SOFT COSTS** |

**H. TIME LIMITS**

No coverage is provided by this Policy for any loss incurred beyond the Time Limit specified:

| 90 Days | **NEWLY ACQUIRED LOCATIONS** – following date of acquisition |
|---|---|
| 12 Months | **PERIOD OF INDEMNITY** |
| Not Covered | **CIVIL OR MILITARY AUTHORITY** – consecutive days |
| 30 Days | **INGRESS/EGRESS** – consecutive days |
| Not Covered | Ordinary payroll |

### I. WAITING PERIODS

Coverage is provided by this Policy only if the Waiting Period indicated is exceeded by the period of interruption or period of time during which access and/or ingress/egress is prohibited. If the Waiting Period is exceeded then coverage will apply in excess of the applicable Deductible.

72 Hours          **SERVICE INTERRUPTION**

Not Covered       **CIVIL OR MILITARY AUTHORITY**

48 Hours          **INGRESS/EGRESS**

### J. DEDUCTIBLES

In each case of loss covered by this Policy, the Company will be liable only if the Insured sustains loss or damage, including any insured **TIME ELEMENT** loss, in a single "occurrence" greater than the applicable deductible below, and then only for its share of the amount covered by this Policy in excess of the applicable deductible.

1. When this Policy insures more than one "location", the deductible will apply against the total loss covered by this Policy in an "occurrence" except that a deductible that applies on a per "location" basis, if specified, will apply separately to each "location" where the direct physical loss or damage occurred and/or the claimed **TIME ELEMENT** loss was sustained regardless of the number of location(s) involved in the "occurrence".

2. Unless stated otherwise, if two or more deductibles apply to an "occurrence", the total to be deducted will not exceed the largest deductible applicable. For the purpose of this provision, when a separate **PROPERTY DAMAGE** and a separate **TIME ELEMENT** deductible apply, the sum of the two deductibles will be considered a single deductible. If two or more deductibles apply on a per "location" basis in an "occurrence" the largest deductible applicable to each "location" will be applied separately to each such "location".

3. When a % deductible is stated below, whether separately or combined, the deductible is calculated as follows:

   A. **PROPERTY DAMAGE** - % of total insurable values at the time of the loss at each covered "location" involved in the loss or damage.

   B. **TIME ELEMENT** - % of the full **TIME ELEMENT** values that would have been earned in the twelve (12) month period following the "occurrence" by use of the facilities at the "location" where the physical damage occurred plus that proportion of the full **TIME ELEMENT** values at all other "location"(s) where **TIME ELEMENT** loss ensues that was directly affected by use of such facilities and that would have been earned in the twelve (12) month period following the "occurrence" by utilization of:

      i. all of the Insured's operations at any Insured Location(s) where direct physical loss or damage occurred and

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

ii.   in the case of **CONTINGENT TIME ELEMENT**, that portion of operations of the third party which are affected.

Plus,

iii.   that portion of the operations sustaining insured **TIME ELEMENT** loss at any other "location"(s) where insured **TIME ELEMENT** loss ensues.

4.   When the **TIME ELEMENT** deductible is shown as a multiple of "actual daily value", from each claim will be deducted the value of the "actual daily value" times said number.

| | |
|---|---|
| $250,000 | **Property Damage** due to all other perils, except |
| 14 ADV minimum of $250,000 | **Time Element** due to all other perils, except |
| $10,000,000 | **Property Damage** due to "Flexa" |
| 45 ADV minimum of $10,000,000 | **Time Element** due to "Flexa" for the following locations only:<br><br>4343 Kennedy Avenue, East Chicago, IN 46312<br><br>4505 Kennedy Avenue, East Chicago, IN 46312<br><br>628 S Saratoga, Norlite Cohoes, NY 12047 |
| 5% with a minimum of $10,000,000 | **Property Damage** as respect to "Earth movement", "Flood" and "Named Storm", except as indicated below: |
| 14 ADV with a minimum of $10,000,000 | **Time Element** as respect to "Earth movement", "Flood" and "Named Storm" except as indicated below: |
| 2% with a minimum of $10,000,000 PD and T/E combined | "Earth Movement" in a Moderate Hazard Earth Movement Zone |
| 5% with a minimum of $10,000,000 PD & T/E Combined | "Named Storm" in High Hazard Wind Zones |
| 2% with a minimum of $10,000,000 PD & T/E Combined | "Named Storm" in Moderate Hazard Wind Zones |

 © 2019 X.L. America, Inc.  All Rights Reserved.<br>May not be copied without permission.

POLICY NUMBER: US00128761PR23A

## SECTION II. PROPERTY DAMAGE

### A. INSURING AGREEMENT

Subject to the terms, conditions, exclusions and limitations contained herein or endorsed hereon. This Policy covers against risks of direct physical loss or damage to Insured Property at Insured Location(s), provided such direct physical loss or damage occurs during the **POLICY PERIOD** and within the **POLICY TERRITORY.**

### B. INSURED PROPERTY

Insured Location(s) to the extent of the interest of the Insured in such property.

1. Real Property, including buildings and additions under construction at an Insured Location, in which the Insured has an insurable interest.

2. Personal Property:

   a. Owned by the Insured, including the Insured's interest as a tenant in improvements and betterments. In the event of direct physical loss or damage, the Company agrees to accept and consider the Insured as sole and unconditional owner of improvements and betterments, notwithstanding any contract or lease to the contrary.

   b. Of officers and employees of the Insured while on an Insured Location.

   c. Of others in the Insured's custody to the extent the Insured is under obligation to keep insured for physical loss or damage insured by this Policy.

   d. Of others in the Insured's custody to the extent of the Insured's legal liability for physical loss or damage to Personal Property. The Company will defend that portion of any suit against the Insured that alleges such liability and seeks damages for such insured physical loss or damage. The Company may, without prejudice, investigate, negotiate and settle any claim or suit as the Company deems expedient.

3. Insured Location(s) means a "location" within the **POLICY TERRITORY**:

   a. Listed on the latest schedule of locations submitted to and on file with the Company;

   b. Covered under **MISCELLANEOUS UNNAMED LOCATIONS**;

   c. Covered under **NEWLY ACQUIRED LOCATIONS**.

### C. EXCLUDED PROPERTY

This Policy excludes:

1. "Money", "securities", cryptocurrency, bills, notes, or bullion.

2. Land and land improvements including land that has been altered, water or any other substance in or on land. However, this exclusion does not apply to:

   a. Water that is contained within any enclosed tank, piping system or any other processing equipment.

   b. Land improvements consisting of landscape gardening, roadways and pavements, but not including any fill or land beneath such property.

3. Animals, including, but not limited to, aquatic life, domesticated animals, livestock and/or animals held for testing or research or experimental purposes.

4. Growing, standing and/or drying crops or timber.

5.  Watercraft or aircraft, except when unfueled and manufactured by the Insured.

6.  Waterborne equipment or offshore property, including but not limited to, any offshore drilling and production rigs.

7.  Spacecraft and/or satellites, including but not limited to, their launch vehicles and launch sites.

8.  Motor vehicles licensed for highway use, except when at Insured Location(s).

9.  "rolling stock".

10. Underground mines, mine shafts, caverns, tunnels, or any property within such underground mines, mine shafts, caverns or tunnels.

11. Underwater piping and its contents, fittings, conduits, drains or flues, all situated outside Insured Location(s).

12. Dams, dikes, bulkheads, canals, reservoirs, jetties, wharves, piers, docks, levees, bridges and retaining walls, unless specifically listed and values reported in the schedule of locations.

13. Transmission and distribution lines and associated equipment, including but not limited to wires, cables, poles, towers and other structures relating to the transmission or distribution of electrical power, telephone and all other communications and telecommunications services.

14. Property in transit, except as specifically provided under **TRANSPORTATION**.

15. Property sold by the Insured under conditional sale, trust agreement, installment plan or other deferred payment plan after delivery to customers, except as specifically provided under **DEFERRED PAYMENTS.**

16. Jewelry, furs, precious metals, or precious stones.

17. Property owned by or for the interest of Specially Designated Foreign Nationals and Blocked Persons as determined by the United States Department of Treasury Office of Foreign Assets Control.

18. "Electronic data", programs, "media" and software, except when they are "stock in process", "finished goods" manufactured by the Insured, "raw stock", supplies or other "merchandise" not manufactured by the Insured, except as specifically provided under **ELECTRONIC DATA PROCESSING EQUIPMENT AND ELECTRONIC DATA.**

19. "Vacant" or "unoccupied" building(s), including any property therein at Insured Location(s) or property at Insured Location(s) where the insured has ceased operations, except as specifically provided under **VACANCY**.

20. Contractors' and subcontractors' machinery, tools and equipment, unless qualifying for coverage as personal property under the preceding Paragraph **B.**2.

## D. EXCLUSIONS

The following exclusions apply to all coverages unless specifically stated elsewhere in the Policy:

1.  This Policy excludes loss or damage caused by, resulting from, or consisting of:

    a.  indirect or remote loss or damage;

    b.  interruption of business, except as specifically provided under **SECTION III. TIME ELEMENT** of this Policy;

    c.  delay, loss of market or loss of use;

    d.  mysterious disappearance, loss or shortage disclosed on taking inventory, or any unexplained loss;

    e.  enforcement of any law or ordinance;

        (1) regulating the construction, repair, replacement, use or removal, including debris removal, of any property; or

(2) requiring the demolition of any property, including the cost in removing its debris;

except as specifically provided by **DECONTAMINATION COSTS** and **DEMOLITION AND INCREASED COST OF CONSTRUCTION;**

f. loss resulting from the voluntary parting with title or possession of property if induced by any fraudulent act or by false pretense;

g. diminution in value of any property following repair of insured physical loss or damage;

h. loss of warranty.

2. This Policy excludes loss or damage directly or indirectly caused by, resulting from, contributed to, or aggravated by any of the following, regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to the loss:

a. Nuclear reaction or nuclear radiation or radioactive contamination.

However, if direct physical loss or damage by fire results, then only that resulting damage is insured; but not including any loss or damage due to nuclear reaction, radiation or radioactive contamination, except as specifically provided under **RADIOACTIVE DECONTAMINATION**.

b. Involving:

(1) Hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack by any:

(i) government or sovereign power (de jure or de facto);

(ii) military, naval or air force; or

(iii) agent or authority of any party specified in (i) or (ii) above.

(2) Discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion, radiation, or radioactive force, whether in time of peace or war and regardless of who commits the act.

(3) Insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an event.

(4) Seizure or destruction under quarantine or custom regulation, or confiscation by order of any governmental or public authority.

(5) Risks of contraband, or illegal transportation or trade.

c. Any dishonest act, including but not limited to "theft", committed alone or in collusion with others, at any time:

(1) by an Insured or any proprietor, partner, director, trustee, officer, or employee of an Insured; or

(2) by any proprietor, partner, director, trustee, or officer of any business or entity (other than a common carrier) engaged by an Insured to do anything in connection with property insured under this Policy.

However, this exclusion does not apply to direct physical loss or damage intentionally caused by an employee or any individual specified above and done without the knowledge of the Insured.

d. Spill, release, or discharge of any material which is liquefied by heat or in a state of fusion. This exclusion applies without limitation to:

(1) repairing any fault or flaw associated in any way with such spill, release, or discharge;

(2) any cost of removing or recovering the material; and

(3) any claim that such material constitutes "contamination".

e. Lack of the following services:

    (1) incoming electricity, fuel, water, gas, steam, refrigerant;

    (2) outgoing sewerage;

    (3) incoming or outgoing telecommunications services, voice, data or video,

all when caused by any reason outside the Insured Location(s), except as specifically provided under **SERVICE INTERRUPTION – PROPERTY DAMAGE** or **SERVICE INTERRUPTION – TIME ELEMENT.**

f. "Contamination", except as specifically provided under **DEBRIS REMOVAL, DECONTAMINATION COSTS**, and **LAND AND WATER CONTAMINANT OR POLLUTANT CLEANUP, REMOVAL AND DISPOSAL**.

g. Unlawful or unexplained possession, use, release, discharge, detonation, dispersal or disposal of any chemical, bacteriological, viral, radioactive or similar agents or matter, whether in time of peace or war and regardless of who commits the act.

h. Except as specifically provided under **ELECTRONIC DATA PROCESSING EQUIPMENT AND ELECTRONIC DATA**, where there has been:

    (1) any loss, damage, destruction, distortion, interruption, disruption, erasure, deletion, corruption or alteration, "theft", loss of use, reduction in functionality, loss of access to, denial of access to, or breakdown of "electronic data" from any cause whatsoever.

However, in the event that fire or explosion results from the circumstances excluded in h.(1) above, then this Policy, subject to all its terms, conditions, exclusions and limitations, will insure only direct physical loss or damage caused by that fire or explosion.

i. Fungi, mold, mildew, spores, bacteria, or microorganisms including any cost or expense incurred to clean up, remove, remediate, test for, or monitor the presence any fungi, mold, mildew, spores, bacteria or microorganisms.

j. Any cause of loss, coverage, or portion of coverage if a such item is identified as NCP in **SECTION I. POLICY DECLARATIONS**, Paragraph **G. LIMITS OF LIABILITY**. However:

    (1) if NCP for "earth movement" is shown, then if "earth movement" is followed by fire, explosion, or "sprinkler leakage", the damage caused by such fire, explosion, or "sprinkler leakage" would not be excluded by this provision;

    (2) if NCP for "flood" is shown, then if "flood" is followed by fire, explosion or "sprinkler leakage", the damage caused by such fire, explosion or "sprinkler leakage" would not be excluded by this provision;

    (3) if NCP for "named storm" is shown, then if "named storm" is followed by fire, explosion, or "sprinkler leakage" the damage caused by such fire, explosion, or "sprinkler leakage" would not be excluded by this provision;

    (4) if NCP for Windstorm, Hail is shown, then if Windstorm, Hail is followed by fire, explosion, or "sprinkler leakage" the damage caused by such fire, explosion, or "sprinkler leakage" would not be excluded by this provision.

 © 2019 X.L. America, Inc.  All Rights Reserved.<br>May not be copied without permission.

POLICY NUMBER: US00128761PR23A

3. This Policy does not insure any of the following, regardless of any other cause of event that contributes concurrently or in any other sequence to the loss or damage, but, if direct physical loss or damage from a peril not excluded by this Policy results, then only that resulting direct physical loss or damage is insured:

   a. faulty workmanship, material, construction or design from any cause;

   b. loss or damage to stock or material attributable to manufacturing or processing operations while such stock or material is being processed, manufactured, tested, or otherwise worked on;

   c. deterioration, depletion, rust, corrosion, rapid corrosion or erosion, inherent vice or latent defect, wear and tear;

   d. settling, cracking, shrinking, bulging, or expansion of:

      (1) foundations (including any pedestal, pad, platform or other property supporting machinery);

      (2) floors;

      (3) pavements;

      (4) walls;

      (5) ceilings;

      (6) roofs.

   e. changes of temperature (except to machinery or equipment) or changes in relative humidity, whether atmospheric or not;

   f. insect, animal or vermin damage;

   g. disease or infestation;

   h. evaporation or loss of contents;

   i. cumulative effects of smog, smoke, vapor, liquid and dust;

   j. loss or damage to the interior portion of buildings under construction from rain, sleet, or snow, whether or not driven by wind, when installation of the roof, walls and windows of such has not been completed;

   k. loss or damage caused by any act, error, or omission (whether by the Insured or others) with respect to:

      (1) planning, zoning, surveying, siting or developing property;

      (2) establishing or enforcing building codes or standards for construction or materials; or

      (3) designing, establishing the specifications, furnishing work, materials, parts, or equipment, or constructing or maintaining the following property or facilities:

         (i) buildings or structures;

         (ii) improvements or changes in or additions to land or other property; or

         (iii) roads, water mains, sewers, drainage ditches, levees, dams or other facilities;

   regardless whether such property or facilities are insured under this Policy and wherever they may be located.

4. This Policy does not insure loss or damage caused by, resulting from, contributed to, aggravated by, or consisting of the following unless directly resulting from other direct physical loss or damage insured by this Policy:

   a. shrinkage, evaporation, leakage of contents, decay or other spoilage;

   b. changes in color, flavor, texture or finish.

PSP PF 0419             © 2019 X.L. America, Inc. All Rights Reserved.        Page 15 of 58
May not be copied without permission.

5. Except as specifically provided by **EQUIPMENT BREAKDOWN**, this Policy does not insure loss or damage caused by, resulting from, contributed to, aggravated by, or consisting of:

   a. Explosion in or of the following:

      (1) steam boilers, including equipment attached to and forming a part thereof;

      (2) steam turbines;

      (3) steam engines;

      (4) steam pipes connecting any of the foregoing; or

      (5) gas turbines.

   b. Rupture, bursting, cracking, burning, or bulging of the following property owned, operated or controlled by the Insured:

      (1) steam boilers, including equipment attached to and forming a part thereof;

      (2) steam turbines;

      (3) steam engines;

      (4) steam pipes connecting any of the foregoing;

      (5) hot water boilers or other equipment for heating water;

      (6) pressure vessels, including equipment attached to and forming a part thereof; or

      (7) gas turbines.

   c. Mechanical or machinery breakdown, including rupture or bursting caused by centrifugal force.

   d. Electrical injury or disturbance to electrical appliances, devices, fixtures, wiring, or other electrical or electronic equipment, caused by currents generated artificially.

   However, if direct physical loss or damage by fire or explosion results, then only that damage caused by or resulting from the fire or explosion is insured; but not including any loss or damage described in 5.a. to d. above.

6. Except as otherwise provided in **SECTION VI. GENERAL CONDITIONS**, Paragraph **H. PROVISIONS APPLICABLE TO JURISDICTIONS**, this Policy does not cover:

   a. loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with an act of "terrorism" regardless of any other cause or event contributing concurrently or in any other sequence to the loss; and

   b. loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any other way relating to an act of "terrorism".


**E. PROPERTY DAMAGE COVERAGE EXTENSIONS AND ADDITIONAL CONDITIONS**

This Policy includes the following coverage extensions and additional conditions for physical loss or damage insured by this Policy, each of which are subject to any corresponding sublimit for that coverage as listed on the **POLICY DECLARATIONS**. The sublimits do not increase the Policy Limit and are subject to all provisions of this Policy including applicable exclusions and deductibles. Each extension is also subject to any other otherwise-applicable sublimit(s), such that all such applicable sublimit(s) are exhausted at once to the extent of any coverage payment(s). The extensions below also are subject to the applicable deductible(s).

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

POLICY NUMBER: US00128761PR23A

1. **ACCOUNTS RECEIVABLE**

This Policy is extended to cover any shortage in the collection of accounts receivable due from your customers that you are unable to collect, caused by or resulting from insured physical loss or damage to accounts receivable records, including accounts receivable records stored as "electronic data", while anywhere within the **POLICY TERRITORY**, including while in transit. The Company will be liable for the interest charges on any loan to offset impaired collections pending repayment of such sum uncollectible as the result of such loss or damage. Unearned interest and service charges on deferred payment accounts and normal credit losses on bad or otherwise uncollectible debts based on historic collections during the three (3) years prior to the date of loss will be deducted in determining the recovery.

a. In the event of loss to accounts receivable records, the Insured will use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding accounts receivable.

b. The Insured agrees to use any suitable property or service:

(1) owned or controlled by the Insured; or

(2) obtainable from other sources,

in reducing the loss under this Coverage Extension.

c. This Policy covers any other necessary and reasonable costs incurred to reduce the loss that otherwise would be recoverable under this Policy, but only to the extent the losses that otherwise would be recoverable under this Policy are reduced.

d. If it is possible to reconstruct accounts receivable records so that no shortage is sustained, the Company will be liable only for the reasonable and necessary costs incurred for material and time required to re-establish or reconstruct such records, and not for any costs covered by any other insurance, but only to the extent the losses that otherwise would be recoverable under this Policy are reduced.

e. No coverage is provided under this extension for any shortage resulting from:

(1) bookkeeping, accounting or billing errors or omissions; or

(2) alteration, falsification, manipulation; or

(3) concealment, destruction or disposal,

of accounts receivable records committed to conceal the wrongful giving, taking, obtaining or withholding of "money", "securities" or other property; but only to the extent of such wrongful giving, taking, obtaining or withholding.

f. All amounts recovered by the Insured on outstanding accounts receivable on the date of loss will belong and be paid to the Company up to the amount of loss paid by the Company. All recoveries exceeding the amount paid will belong to the Insured.

2. **BRANDS AND LABELS**

If branded or labeled property bearing the Insured's brand or label and insured by this Policy is physically damaged and the Company elects to take all or any part of that property, the Insured may elect to keep that property and deduct from its recoverable claim under this Policy the value of that damaged property that the Company could have recovered through sale or salvage. If the Insured does not elect to keep that property and the Company elects to take all or any part of it, the Insured at the Company's expense may:

a. stamp 'salvage' on the property or its containers; or

b. remove or obliterate the brands or labels,

© 2019 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

if doing so will not further physically damage the property. In either event, the Insured must re-label such property or its containers to be in compliance with any applicable law.

3. **CONSEQUENTIAL REDUCTION IN VALUE**

This Policy is extended to cover the reduction in value of insured "merchandise" that is a part of pairs, sets, or components, directly resulting from physical loss or damage insured by this Policy to other insured parts of pairs, sets or components of such "merchandise". If settlement is based on a constructive total loss, the Insured will surrender the undamaged parts of such "merchandise" to the Company.

4. **CONTROL OF DAMAGED PROPERTY**

This Policy gives control of physically damaged property consisting of all "merchandise" manufactured by the Insured, "raw stock" used in the Insured's manufacturing process, work in process being manufactured by the Insured, or "finished goods" manufactured by the Insured as follows:

a. The Insured using reasonable judgment, and giving due consideration to the **BRANDS AND LABELS** provision of this Policy, will decide if the property can be reprocessed, sold, and/or salvaged.

b. Property so judged by the Insured to be unfit for reprocessing, selling, or salvage will not be sold and will be disposed of at the direction of the Insured unless the Insured consents otherwise.

c. Any salvage proceeds received will go to the:

(1) Company at the time of loss settlement; or

(2) Insured if received prior to loss settlement and such proceeds will reduce the amount of loss payable by the Company under the Policy accordingly.

5. **COURSE OF CONSTRUCTION**

This Policy is extended to cover:

a. New buildings or structures at Insured Location(s), including machinery, equipment, materials and supplies at Insured Location(s) intended to become a permanent part thereof, while in the course of construction;

b. Existing buildings or structures at Insured Location(s), including machinery, equipment, materials and supplies at the Insured Location(s) intended to become a permanent part thereof, while in the course of alteration, extension or renovation;

all in which the Insured has an insurable interest at the time of loss or damage.

6. **DEBRIS REMOVAL**

a. This Policy is extended to cover the reasonable and necessary costs incurred to remove debris from Insured "Location(s)" that remains as a direct result of direct physical loss or damage caused by a peril insured by this Policy.

b. This extension does not cover the costs of removal of:

(1) contaminated uninsured property; or

(2) the "contaminants" in or on uninsured property,

whether or not the "contamination" results from insured physical loss or damage.

7. **DECONTAMINATION COSTS**

   a. This Policy is extended to cover:

     (1) direct physical loss or damage to Insured Property at Insured Location(s) caused by the actual presence of "contaminants" in or on such Insured Property; and

     (2) any additional cost incurred by the Insured in order to satisfy the minimum requirements of any law or ordinance in effect at the time of the loss or damage in a.(1) above that regulates the cleanup or removal of such "contaminants";

   provided that the release, discharge or dispersal of the "contaminants" into or onto Insured Property is a direct result of direct physical loss or damage caused by a peril insured by this Policy to Insured Property at Insured Location(s).

   b. No coverage is provided under this extension for:

     (1) "raw stock", "stock in process" and "finished goods", whether manufactured by the insured or not;

     (2) the cost required to remove:

       (i) property excluded under **EXCLUDED PROPERTY** because of the actual or suspected presence of "contaminants" therein or thereon; or

       (ii) the "contaminants" in or on property excluded under **EXCLUDED PROPERTY**.

8. **DEFERRED PAYMENTS**

   a. This Policy is extended to cover direct physical loss or damage by a peril insured by this Policy to Personal Property of the type insured by the Policy and sold by the Insured under a conditional sale or trust agreement or any installment or deferred payment plan and after such property has been delivered to the buyer. Coverage is limited to the unpaid balance for such property.

   In the event of direct physical loss or damage to property sold under deferred payment plans, the Insured will use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding amounts due or to regain possession of the property.

   b. No coverage is provided under this extension for loss:

     (1) pertaining to products recalled including, but not limited to, the costs to recall, test or to advertise such recall by the Insured;

     (2) from "theft" or conversion by the buyer of the property after the buyer has taken possession of such property;

     (3) to the extent the buyer continues payments;

     (4) not within the **POLICY TERRITORY**.

9. **DEMOLITION AND INCREASED COST OF CONSTRUCTION**

   a. This Policy is extended to cover the reasonable and necessary costs incurred, described in item c. below, to satisfy the minimum requirements of the enforcement of any law or ordinance regulating the demolition, construction, repair, replacement or use of buildings or structures at Insured Location(s), provided:

     (1) such law or ordinance is in force on the date of insured physical loss or damage; and

     (2) its enforcement is a direct result of such insured physical loss or damage; and

     (3) the law or ordinance being enforced is not one that the Insured was required to comply with prior to the date of direct physical loss or damage, but failed to do so.

© 2019 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

b. This Coverage Extension does not cover loss due to any law or ordinance with which the Insured was required to comply had the loss not occurred.

c. This Coverage Extension, as respects the property insured in item (a) above, covers:

(1) the cost to repair or rebuild the physically damaged portion of such property with materials and in a manner to satisfy such law or ordinance;

(2) the cost to:

(i) demolish the physically undamaged portion of such property insured;

(ii) remove debris resulting from such demolition; and

(iii) rebuild such undamaged portion that has been demolished subject to the same provisions under **VALUATION** that applies to the damaged portion with materials and in a manner to satisfy such law or ordinance, to the extent that such costs result from the demolition of the Insured Location(s) is required to satisfy such law or ordinance;

(3) the increase in **TIME ELEMENT** loss arising out of additional time required to comply with such law and ordinance.

d. This Coverage Extension excludes any costs incurred as a direct or indirect result of enforcement of any laws or ordinances regulating any form of "contamination" or "contaminants".

e. The Company's maximum liability for this Coverage Extension at Insured Location(s) in any "occurrence" will not exceed the actual cost incurred in demolishing the physically undamaged portion of the property insured in item a above plus the lesser of:

(1) the reasonable and necessary actual cost incurred, excluding the cost of land, in rebuilding on another site; or

(2) the cost of rebuilding on the same site.

10. **ELECTRONIC DATA PROCESSING EQUIPMENT AND ELECTRONIC DATA**

a. This Policy is extended to cover direct physical loss or damage to "electronic data processing equipment" at Insured Location(s) and the reasonable expenses incurred by the Insured to replace or restore "electronic data" which has been destroyed or corrupted by the following specified perils: fire, lightning, explosion, windstorm, hail, "earth movement", "flood", aircraft or vehicle impact, riot, civil commotion, smoke, or leakage or automatic discharge from fire protection systems at Insured Location(s).

b. However, this extension excludes:

(1) loss, damage, corruption, destruction, distortion, interruption, disruption, erasure, deletion, alteration, "theft", loss of use, reduction in functionality, loss of access to, denial of access to, or breakdown of "electronic data" from any cause whatsoever except for those specific perils identified in section a. above;

(2) loss or damage caused by or resulting from the introduction of a "computer virus" or similar malicious code;

(3) loss or damage caused by or resulting from manipulation of "electronic data processing equipment" and "media" by anyone, including but not limited to any employee or service provider hired by the insured to inspect, install, modify, maintain, repair or replace "electronic data processing equipment" and "electronic data";

(4) errors or omissions in processing or copying;

(5) errors or omissions in programming or machine instructions;

 © 2019 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

(6) any **TIME ELEMENT** loss, including, but not limited to, interruption of business, extra expense, rental value, royalties, expediting expense and leasehold interest, result from any loss, damage, corruption, destruction, distortion, interruption, disruption, erasure, deletion, alteration, "theft", loss of use, reduction in functionality, loss of access to, denial of access to, or breakdown of "electronic data".

11. **ERRORS AND OMISSIONS**

a. This Policy is extended to cover physical loss or damage to insured property which is not payable under this Policy because of an unintentional omission or error at the time of Policy inception in the description or inclusion of any "location" owned, occupied, leased or rented by the Insured to be an Insured Location(s); but only to the extent this Policy would have provided coverage had the unintentional omission or error not been made.

b. It is a condition of this Coverage Extension that any error or unintentional omission be reported and corrected by the Insured to the Company when discovered.

c. This extension does not apply if there is coverage available under **NEWLY ACQUIRED LOCATIONS** or **MISCELLANEOUS UNNAMED LOCATIONS**.

12. **EXPEDITING COSTS**

a. This Policy is extended to cover the reasonable and necessary costs incurred to pay for the temporary repair of insured physical loss or damage to insured property and to expedite the permanent repair or replacement of such damaged property.

b. This extension does not cover costs:

(1) recoverable elsewhere in this Policy; or

(2) of permanent repair or replacement of damaged property other than the cost to expedite.

13. **FINE ARTS**

a. This Policy covers insured physical loss or damage to "fine arts" articles while at Insured Location(s).

b. No coverage is provided under this extension for:

(1) deterioration, wear and tear or inherent vice;

(2) fungus, mold or mildew; unless directly resulting from other physical damage not excluded by this Policy;

(3) loss or damage from any repairing, restoration or retouching process.

14. **FIRE DEPARTMENT SERVICE CHARGES**

This Policy is extended to cover the following reasonable and necessary expenses resulting from costs of fire extinguishing materials expended or incurred by the Insured when the Fire Department is called to save or protect property at Insured Location(s), including costs:

a. assumed by contract or agreement prior to loss or damage; or

b. required by local ordinance.

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

15. **LAND AND WATER CONTAMINANT OR POLLUTANT CLEANUP, REMOVAL AND DISPOSAL**

   a. This Policy is extended to cover the reasonable and necessary cost for the cleanup, removal and disposal of the actual and confirmed (not suspected) presence of "contaminants" from uninsured property consisting of land, water or any other substance in or on land at Insured Location(s), if the release, discharge or dispersal of "contaminants" is a direct result of insured physical loss or damage to insured property.

   b. This Policy does not cover the cost to cleanup, remove and dispose of "contaminants" or pollutants from such property:

   (1) at any "location" insured for Personal Property only;

   (2) at any "location" insured under **ERRORS AND OMISSIONS, NEWLY ACQUIRED LOCATIONS** or **MISCELLANEOUS UNNAMED LOCATIONS**; or

   (3) when the Insured fails to give written notice of loss to the Company within one hundred and eighty (180) days after inception of the loss.

16. **MISCELLANEOUS UNNAMED LOCATIONS**

   a. This Policy is extended to cover insured property at any "miscellaneous unnamed location(s)" within the **POLICY TERRITORY** that is owned, rented or leased by the Insured.

   b. No coverage is provided under this extension for any property:

   (1) while in transit;

   (2) while waterborne;

   (3) covered under **NEWLY ACQUIRED LOCATIONS**;

   (4) covered under **ERRORS AND OMISSIONS**;

   (5) otherwise covered elsewhere in this Policy or any other policy issued by the Company to the Insured.

17. **NEWLY ACQUIRED LOCATIONS**

   a. This Policy is extended to cover insured property at any location within the **POLICY TERRITORY** that is purchased, leased or rented by the Insured after the inception date of the Policy.

   b. Coverage provided under this extension:

   (1) Starts on the date of such purchase, lease or rental by the Insured; and

   (2) Ends when the earliest of the following occurs:

   (i) addition of such location to the Policy is submitted to and accepted by Company; or

   (ii) exceeded the number of consecutive days shown in the **POLICY DECLARATIONS**.

   c. No coverage is provided under this extension for any property:

   (1) while in transit;

   (2) while waterborne;

   (3) covered under **MISCELLANEOUS UNNAMED LOCATIONS**;

   (4) covered under **ERRORS AND OMISSIONS**;

   (5) otherwise covered elsewhere in the Policy or any other Policy issued by the Company to the Insured.

 © 2019 X.L. America, Inc.  All Rights Reserved.<br>May not be copied without permission.

POLICY NUMBER: US00128761PR23A

18. **PROFESSIONAL FEES**

   a. This Policy is extended to cover the reasonable and necessary expense actually incurred by the Insured, for fees payable to the Insured's accountants, architects, auditors, engineers, or other professionals and the cost of using the Insured's employees, for producing and certifying any particulars or details contained in the Insured's books or documents, or such other proofs, information or evidence required by the Company resulting from insured loss payable under this Policy for which the Company has accepted liability.

   b. The amounts insured hereunder do not include fees or costs of:

   (1) attorneys, public adjusters, insurance brokers, or loss appraisers, all including any of their subsidiary, related or associated entities, either partially or wholly owned by them or retained by them for the purpose of assisting them;

   (2) loss consultants who provide consultation on coverage or negotiate claims; without the written consent of the Company.

19. **PROTECTION AND PRESERVATION OF PROPERTY**

   a. This Policy is extended to cover:

   (1) Reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property.

   (2) Reasonable and necessary:

   (i) costs incurred of restoring and recharging fire protection systems following an insured loss;

   (ii) costs incurred for the water used for fighting a fire in, on or exposing the insured property;

   (iii) Emergency Services response as a result of responding to an insured loss.

   b. This Extension is subject to the deductible provisions that would have applied had the physical loss or damage occurred.

20. **SERVICE INTERRUPTION – PROPERTY DAMAGE**

   a. This Policy is extended to cover insured physical loss or damage to insured property at Insured Location(s) when such physical loss or damage results from the interruption of the specified incoming services consisting of electricity, gas, fuel, steam, refrigeration, water or from the lack of outgoing sewerage service by reason of direct physical loss or damage to the service provider's property caused by a peril insured by this Policy at the facilities of the supplier of such service located within the **POLICY TERRITORY**, that immediately prevents in whole or in part the delivery of such usable service.

   b. This extension will apply when the "period of service interruption" is in excess of the Waiting Period as stated in the **POLICY DECLARATIONS**.

   c. The following provisions apply:

   (1) The Insured will immediately notify the suppliers of services of any interruption of such services.

   (2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions for the supply of such specified services.

21. **RADIOACTIVE DECONTAMINATION**

 © 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

This Policy is extended to cover direct physical loss or damage to Insured Property at Insured Location(s) caused by sudden and accidental radioactive contamination, including resultant radiation damage, from material used or stored at an Insured Location(s) or from processes conducted at such Insured Location(s) provided that on the date of loss, there is neither a nuclear reactor nor any new or used nuclear fuel at such Insured Location(s).

No coverage is provided under this extension for radioactive contamination caused by or resulting from "terrorism" or from the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion, radiation or radioactive force, whether in time of peace or war and regardless of who commits the act.

22. **TAX TREATMENT OF PROFITS**

This Policy is extended to cover the increased tax liability from an insured loss at Insured Location(s) if the tax treatment of:

a. the profit portion of a loss payment under this Policy involving "finished stock" manufactured by the Insured; and/or

b. the profit portion of a **TIME ELEMENT** loss payment under this Policy;

is greater than the tax treatment of profits that would have been incurred had no loss occurred.

23. **TEMPORARY REMOVAL OF PROPERTY**

a. When Insured Property is removed from Insured Location(s) for the purpose of being repaired or serviced or in order to avoid immediately impending physical loss or damage by a peril insured by this Policy, this Policy covers such property:

(1) while at the "location" to which such property has been moved; and

(2) for physical loss or damage as provided at Insured Location(s) from which such property was removed.

b. This extension does not apply to property:

(1) Insured, in whole or in part, elsewhere in this Policy.

(2) Insured, in whole or in part, by any other insurance policy.

(3) Removed for normal storage, maintenance, processing or preparation for sale or delivery.

24. **TRANSPORTATION**

a. This Policy is extended to cover direct physical loss or damage to insured Personal Property and the Insured's interest in Personal Property of Others while in transit within the **POLICY TERRITORY** and including:

(1) The Insured's loss of property caused by fraud or deceit perpetrated by any person or persons who may represent themselves to be the proper party or parties to receive goods for shipment or accept goods for delivery.

(2) The Insured's legal liability as a carrier of lawful goods and "merchandise" by vehicles under bills of lading or shipping receipts issued by the Insured, while in the Insured's custody or in the custody of connecting carriers in transit.

(3) The Insured's interest in general average, salvage and other charges on shipments covered hereunder.

(4) The Insured is granted the privilege to ship under released or limited bills of lading or shipment receipts.

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

b.  The Company will not pay for loss or damage to:

   (1) property while waterborne, except:

      (i)  while on the navigable inland waterways; or

      (ii) while on coastal shipments.

   (2) property shipped by mail from the time it passes into custody of any governmental postal service;

   (3) property for sale while in the care, custody or control of the Insured's sales persons or representatives;

   (4) any conveyance used for property in transit;

   (5) property insured under any import or export ocean marine insurance; or

   (6) property under airborne shipment unless by regularly scheduled passenger airlines or air freight carriers.

c.  If this Policy expires during the due course of transit, coverage is extended until the shipment is delivered to its final destination.

25. **VACANCY**

This Policy is extended to cover:

a.  "vacant" or "unoccupied" buildings, including insured Property therein, at Insured Location(s);

b.  Insured property at Insured Location(s) where the Insured has ceased operations;

Coverage under Sections a. and b. is available provided that:

   (1) existing fire protection, heating system, watch and alarm services at such Insured Location(s) are maintained; and

   (2) written notice is given to the Company prior to the 120th consecutive day of cessation of operations, vacancy or unoccupancy.

26. **VALUABLE PAPERS AND RECORDS**

a.  This Policy is extended to cover insured physical loss or damage to "valuable papers and records" while anywhere within the **POLICY TERRITORY**, including while in transit.

b.  This extension excludes:

   (1) loss or damage to property described below, if such property cannot be replaced with other of like kind and quality, unless specifically declared to the Company;

   (2) loss or damage to property held as samples or for sale or for delivery after sale;

   (3) errors or omissions in processing, or copying; all unless physical loss or damage by a peril not excluded by this Policy results, in which event, only that resulting damage is insured;

   (4) deterioration, inherent vice, vermin or wear and tear; all unless physical loss or damage not excluded by this Policy results, in which event, only that resulting damage is insured.

## SECTION III. TIME ELEMENT

### A. LOSS INSURED

1. This Policy insures **TIME ELEMENT** loss, as provided in the **TIME ELEMENT COVERAGES**, directly resulting from direct physical loss or damage by a peril insured by this Policy:

   a. to property covered by this Policy and not otherwise excluded by this Policy or otherwise limited in the **TIME ELEMENT COVERAGES**;

   b. to property at Insured Location(s); or within one thousand (1,000) feet of it; or to the extent provided under **TEMPORARY REMOVAL OF PROPERTY**;

   c. to property covered under **ERRORS AND OMISSIONS, MISCELLANEOUS UNNAMED LOCATIONS** and **NEWLY ACQUIRED LOCATIONS**;

   d. to property while in transit covered under **TRANSPORTATION**;

   during the **PERIODS OF INDEMNITY** described in this section.

2. This Policy insures **TIME ELEMENT** loss only to the extent it cannot be reduced through:

   a. the use of any property or service owned or controlled by the Insured;

   b. the use of any property or service obtainable from other sources;

   c. working extra time or overtime; or

   d. the use of inventory,

   all whether at Insured Location(s) or at any other "location". The Company reserves the right to take into consideration the combined operating results of all associated, affiliated or subsidiary companies of the Insured in determining the **TIME ELEMENT** loss.

3. This Policy covers expenses reasonably and necessarily incurred by the Insured to reduce the loss that otherwise would be payable under this section of this Policy. The amount of such recoverable expenses will not exceed the amount by which the covered loss has been reduced.

4. Except as respects **LEASEHOLD INTEREST**, in determining the actual loss sustained as insured hereunder, due consideration shall be given to the business experience of the Insured before the date of direct physical loss or damage and the probable experience thereafter had the direct physical loss or damage to insured property not occurred.

### B. TIME ELEMENT EXCLUSIONS

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to **TIME ELEMENT** loss:

This Policy does not insure against:

1. Any loss during any idle period, including but not limited to when production, operation, service or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:

   a. physical loss or damage not insured by this Policy on or off of Insured Location(s);

   b. planned or rescheduled shutdown;

   c. strikes or other work stoppage; or

   d. any other reason other than direct physical loss or damage to property insured by this Policy by a peril insured by this Policy.

 © 2019 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

2. Any increase in loss due to:

    a. fines or damages for breach of contract or for late or incompletion of orders; and

    b. for penalties of any nature.

3. Any loss resulting from loss or damage to "finished goods" manufactured by the Insured, nor the time required for their reproduction.

## C. TIME ELEMENT COVERAGES

These **TIME ELEMENT COVERAGES** are subject to the deductibles and sublimits, if any, applicable to the peril that caused the direct physical loss or damage as necessary for these coverage extensions to apply, unless the deductible specified for these coverage extensions is greater or the sublimit is lower, in which event the higher deductible and lower sublimit will apply.

    a. If the insured submits values on the "gross earnings" basis then the loss will be calculated in accordance with **GROSS EARNINGS** including calculation of the any limits, deductible as well as any applicable **TIME ELEMENT COVERAGE EXTENSIONS**.

    b. If the insured submits values on the "gross profits" basis then the loss will be calculated in accordance with **GROSS PROFITS** including calculation of the any limits, deductible as well as any applicable **TIME ELEMENT COVERAGE EXTENSIONS**.

    c. If the insured fails to submit values on either a "gross earnings" or "gross profit" basis, any recovery would be limited to the lesser of the calculations for a. or b. above.

    d. In no event can the insured recover for any loss under both "gross earnings" and "gross profits" basis.

### 1. GROSS EARNINGS

    a. The recoverable "gross earnings" loss is the actual loss sustained by the Insured due to the necessary interruption of the Insured's business during the **PERIOD OF INDEMNITY** less all charges and expenses that do not necessarily continue during such interruption.

    b. In determining the indemnity payable as the actual loss sustained, the Company will consider the continuation of only those "normal" charges and expenses including "ordinary payroll".

    c. There is recovery hereunder but only to the extent that the Insured:

        (1) experiences a necessary interruption of business that prevents it from producing goods or continuing business operations or services and is unable to make up lost production within a reasonable period of time, not limited to the period during which production is interrupted;

        (2) is unable to continue such operations or services during the **PERIOD OF INDEMNITY**; and

        (3) is able to demonstrate a loss of sales for the operations, services or production interrupted.

    d. In determining the actual loss sustained as insured hereunder, due consideration shall be given to the business experience of the Insured before the date of direct physical loss or damage and the probable experience thereafter had the direct physical loss or damage to insured property not occurred.

© 2019 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

2. **GROSS PROFITS**

   a. The recoverable "gross profit" loss is the actual loss sustained by the Insured of the following due to the necessary interruption of the Insured's business during the **PERIOD OF INDEMNITY**:

      (1) Reduction In Sales, and

      (2) Increase In Cost Of Doing Business.

   b. The amount payable as indemnity hereunder will be:

      (1) with respect to Reduction In Sales: The sum produced by applying the "rate of gross profit" to the amount by which the "sales" during the **PERIOD OF INDEMNITY** will fall short of the "standard sales". In determining the Reduction In Sales, any amount recovered under **PROPERTY DAMAGE** coverage at selling price for loss or damage to or destruction of "finished goods" or "merchandise" will be credited against lost sales.

      (2) with respect to Increase In Cost of Doing Business:

         (i) the additional expenditure necessarily and reasonably incurred for the sole purpose of avoiding or diminishing the Reduction In Sales which, but for that expenditure, would have taken place during the **PERIOD OF INDEMNITY**; but

         (ii) not exceeding the sum produced by applying the "rate of gross profit" to the amount of the reduction thereby avoided,

         all less any sum saved during the **PERIOD OF INDEMNITY** with respect to such of the insured "fixed charges" as may cease or be reduced because of such interruption of business.

   c. In determining the indemnity payable as the actual loss sustained:

      (1) if any "fixed charges" of the business are not insured hereunder, then, in computing the amount recoverable hereunder as Increase In Cost of Doing Business, that proportion only of the additional expenditure will be recoverable hereunder which the sum of the "net profit" and the insured "fixed charges" bears to the sum of the "net profit" and all the "fixed charges".

      (2) if during the **PERIOD OF INDEMNITY** goods will be sold or services will be rendered elsewhere than at Insured Location(s) for the benefit of the business, either by the Insured or by others on the Insured's behalf, the money paid or payable in respect of such "sales" or services will be included in arriving at the amount of "sales" during the **PERIOD OF INDEMNITY.**

   d. The Insured will act with due diligence and dispatch in repairing or replacing physically damaged buildings and equipment to the same or equivalent physical and operating conditions that existed prior to the damage; and take whatever actions are necessary and reasonable to minimize the loss payable hereunder.

   e. As respects **GROSS PROFITS**, the **TIME ELEMENT EXCLUSIONS** 1 and 2 of this section do not apply and the following applies instead:

      This Policy does not insure against any increase in loss due to fines or damages for breach of contract or for late or non-completion of orders, or penalties of any nature.

   f. Coverage under **GROSS PROFIT** for the Reduction In Sales due to contract cancellation will include only those "sales" that would have been earned under the contract during the **PERIOD OF INDEMNITY.**

 © 2019 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

POLICY NUMBER: US00128761PR23A

3. **EXTRA EXPENSE**

   a. The recoverable **EXTRA EXPENSE** will be the reasonable and necessary extra costs incurred by the Insured of the following during the **PERIOD OF INDEMNITY**:

      (1) Expenses above what normally would have been incurred by the Insured to temporarily continue as nearly "normal" as practicable the conduct of the Insured's business following insured physical loss or damage; and

      (2) Extra costs of temporarily using property or facilities of the Insured or others,

      less any value remaining at the end of the **PERIOD OF INDEMNITY** for property obtained in connection with the above.

   b. As respects **EXTRA EXPENSE**, the following are also excluded:

      (1) Any loss of income.

      (2) Costs that normally would have been incurred in conducting the business during the same period had no physical loss or damage occurred.

      (3) Cost of permanent repair or replacement of property that has been damaged or destroyed.

      (4) Any expense recoverable elsewhere in this Policy.

4. **COMMISSIONS, PROFITS AND ROYALTIES**

   a. The recoverable **COMMISSION, PROFITS AND ROYALTIES** loss is the actual loss sustained by the Insured of the following during the **PERIOD OF INDEMNITY**:

      (1) "Commissions", "profits" and "royalties";

      (2) Less non-continuing expenses and charges during the **PERIOD OF INDEMNITY**.

   b. The **COMMISSION, PROFITS AND ROYALTIES** payable hereunder will be the actual loss sustained by the Insured during the **PERIOD OF INDEMNITY** because of the inability to benefit under any royalty, licensing fee or commission agreement between the Insured and another party due to physical loss or damage by a peril insured by this Policy to property of the other party of the type insured by this Policy located within the **POLICY TERRITORY**.

   c. The Insured will influence, to the extent possible, said party(ies) with whom the agreements described above have been made to use any other machinery, supplies or locations in order to resume business so as to reduce the amount of loss hereunder, and the Insured will cooperate with that party in every way to effect this. This Policy does not cover any cost to effect the above unless authorized in advance by the Company.

   d. In determining the indemnity payable hereunder, the Company will consider the amount of income derived from such agreements before and the probable amount of income after the date of loss or damage.

   e. There is recovery hereunder but only if such loss or damage interrupts the delivery of goods in whole or in part to the Insured or for their account.

5. **LEASEHOLD INTEREST**

   a. In the event of direct physical loss or damage by a peril insured by this Policy to Insured Location(s) leased by the Insured, the recoverable **LEASEHOLD INTEREST** loss incurred by the Insured shall be measured as follows:

© 2019 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

(1) If the lease agreement requires continuation of rent and if the property is wholly untenantable or unusable, the actual rent payable for the unexpired term of the lease; or if the property is partially untenantable or unusable, the proportion of the rent payable for untenantable or unusable portion of the property.

(2) If the lease is canceled by the lessor or the Insured pursuant to the lease agreement or by the operation of law; the "lease interest" for the first three (3) months following the loss and the "net lease interest" for the remaining unexpired term of the lease.

b. As respects **LEASEHOLD INTEREST**:

(1) This Policy does not insure any increase in loss resulting from the suspension, lapse or cancellation of any license, or from the Insured exercising an option to cancel the lease; or from any act or omission of the Insured that constitutes a default under the lease.

(2) In addition, there is no coverage for the Insured's loss of **LEASEHOLD INTEREST** directly resulting from physical loss or damage to Personal Property.

6. **RENTAL INSURANCE**

a. In the event of direct physical loss or damage to Insured Location(s) rented by the Insured, in whole or in part, to others, the recoverable **RENTAL INSURANCE** loss is the actual loss sustained by the Insured of the following during the **PERIOD OF INDEMNITY**:

(1) The fair rental value of any portion of the property occupied by the Insured and no longer able to be occupied;

(2) The income reasonably expected from rentals of "unoccupied" or unrented portions of such property; and

(3) The rental income lost from the rented portions of such property according to bona fide leases, contracts or agreements in force at the time of loss,

less all non-continuing charges and expenses.

b. This Policy does not insure any loss of rental income during any period in which the insured property would not have been tenantable for any reason other than an insured loss.

7. **TIME ELEMENT INTERDEPENDENCY**

If physical loss or damage not otherwise excluded by this Policy at Insured Location(s) results in a **TIME ELEMENT** loss at other Insured Location(s), then such resulting **TIME ELEMENT** loss will be adjusted based on the provisions of this section that apply to the Insured Location(s) where such physical loss or damage occurred.

**D. TIME ELEMENT COVERAGE EXTENSIONS**

These **TIME ELEMENT COVERAGE EXTENSIONS** are subject to the deductibles and sublimits, if any, applicable to the peril that caused the direct physical loss or damage as necessary for these coverage extensions to apply, unless the deductible specified for these coverage extensions is greater or the sublimit is lower, in which event the higher deductible and lower sublimit will apply.

1. **CIVIL OR MILITARY AUTHORITY**

a. This Policy is extended to cover the actual loss sustained and **EXTRA EXPENSE** incurred by the Insured during the **PERIOD OF INDEMNITY** if the Insured experiences a necessary interruption of the Insured's business operations because of an order of civil authority that prohibits access to the Insured Location(s) provided such order is the direct result of actual physical loss or damage to

© 2019 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

property of the type insured under this Policy by a peril insured by this Policy at Insured Location(s) and within the distance specified (distance limitation) in the **POLICY DECLARATIONS**.

b. The **PERIOD OF INDEMNITY** for this extension will be the period of time:

(1) starting at the time of the prohibition of access; but

(2) not to exceed the number of consecutive days following such order as stated in the **POLICY DECLARATIONS**, up to the limit applying to this Coverage Extension.

This period of time is part of, and not in addition to, any **PERIOD OF INDEMNITY** applying to any coverage provided in the **TIME ELEMENT** section.

c. This extension does not apply to **LEASEHOLD INTEREST**.

2. **CONTINGENT TIME ELEMENT**

a. This Policy is extended to cover the actual loss sustained and **EXTRA EXPENSE** incurred by the Insured during the **PERIOD OF INDEMNITY** if the Insured experiences a necessary interruption of the Insured's business operations at Insured Location(s) because of direct physical loss or damage to property of the type insured under this Policy by a peril insured by this Policy at "contingent time element location(s)" located within the **POLICY TERRITORY**.

b. The Insured will influence and cooperate with the "contingent time element location(s)" in every way and take any reasonable and necessary action, including the use of the other machinery, supplies or locations, to effect mitigation of the loss payable hereunder.

c. This Policy does not insure **CONTINGENT TIME ELEMENT** loss resulting from:

(1) Lack of incoming or outgoing transmission of voice, data or video;

(2) Lack of Incoming or outgoing electricity, fuel, gas, steam, water, refrigeration, sewage, or any other utility service; or

(3) Physical loss or damage caused by or resulting from any act of "terrorism", regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence of loss.

3. **EXTENDED PERIOD OF INDEMNITY**

a. This Policy is extended to cover the additional length of time:

(1) as would be required to restore business operations, with due diligence, to the condition that would have existed had no direct physical loss or damage occurred; or

(2) beginning on the date the applicable **PERIOD OF INDEMNITY** ends.

b. Coverage provided under this extension is subject to the Time Limit specified in the **POLICY DECLARATIONS**. Such Time Limit begins on the date the applicable **PERIOD OF INDEMNITY** ends.

c. Coverage provided under this extension applies only to **GROSS EARNINGS, RENTAL INSURANCE**, and **IMPOUNDED WATER**.

4. **IMPOUNDED WATER**

a. This Policy is extended to cover the actual loss sustained and the **EXTRA EXPENSE** incurred by the Insured during the **PERIOD OF INDEMNITY** if the Insured experiences a necessary interruption of the Insured's business operations at Insured Location(s) because of inadequate water supply.

 © 2019 X.L. America, Inc.  All Rights Reserved.<br>May not be copied without permission.

POLICY NUMBER: US00128761PR23A

b.  It is a condition precedent to recovery under this extension that such inadequate water supply is a direct result of the release of water:

(1) stored behind dams or in reservoirs;

(2) used for any manufacturing purpose, including but not limited to as raw material or for power; and

(3) at Insured Location(s);

caused by direct physical loss or damage by a peril insured by this Policy to such dams or reservoirs, or to equipment connected thereto.

c.  Notwithstanding the coverage provided under this extension and unless **EXCLUDED PROPERTY** section is amended by endorsement accordingly, dams and reservoirs are not Insured Property and physical loss or damage thereto is not covered by this Policy.

5.  **INGRESS/EGRESS**

a.  This Policy is extended to cover the actual loss sustained and **EXTRA EXPENSE** incurred by the Insured during the **PERIOD OF INDEMNITY** if the Insured experiences a necessary interruption of the Insured's business operations at Insured Location(s) because of a prevention of ingress to or egress from Insured Location(s), whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical loss or damage by a peril insured by this Policy, to the type of property insured by this Policy and within the distance specified (distance limitation) in the **POLICY DECLARATIONS**.

b.  This extension does not insure loss resulting from:

(1) lack of incoming or outgoing service consisting of electric, fuel, gas, water, steam, refrigerant, sewerage and voice, data or video; or

(2) picketing or other action by strikers.

c.  No coverage is provided under this extension for more than the number of consecutive days as stated in the **POLICY DECLARATIONS**, up to the limit applying to this Coverage Extension.

6.  **PROTECTION AND PRESERVATION OF PROPERTY – TIME ELEMENT**

a.  This Policy is extended to cover the actual loss sustained by the Insured for a period of time not to exceed forty-eight (48) hours prior to and forty-eight (48) hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending physical loss or damage insured by this Policy at such insured property.

b.  This Extension is subject to the deductible provisions that would have applied had the physical loss or damage occurred.

7.  **RESEARCH AND DEVELOPMENT**

a.  This Policy is extended to cover the actual loss sustained by the Insured comprised solely of continuing "fixed charges" and "ordinary payroll" directly attributable to the interruption of research and development activities that in themselves would not have produced income during the **PERIOD OF INDEMNITY**.

b.  The **PERIOD OF INDEMNITY** for this extension will be the period from the time of direct physical loss or damage by a peril insured by this Policy to property of the type insured by this Policy to the time when the property could be repaired or replaced and made ready for operations with the exercise of due diligence and dispatch, but not to be limited by the date of expiration of this Policy.

8. **SERVICE INTERRUPTION – TIME ELEMENT**

   a. This Policy is extended to cover the actual loss sustained and **EXTRA EXPENSE** incurred by the Insured during the "period of service interruption" at Insured Location(s) when the insured experiences a necessary interruption of the Insured's business operations caused by the interruption of incoming services consisting of electricity, industrial and natural gas, steam, fuel, water, refrigeration or from a lack of outgoing sewerage service by reason of direct physical loss or damage by a peril insured by this Policy at the facilities of the supplier of such service located within the **POLICY TERRITORY**, that immediately prevents in whole or part the delivery of such usable services.

   b. This extension will apply when the "period of service interruption" is in excess of the Waiting Period as stated in the **POLICY DECLARATIONS**.

   c. The Insured will immediately notify the suppliers of services of any interruption of such services.

   d. The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with any terms and conditions of for the supply of such specified services.

9. **SOFT COSTS**

   This Policy is extended to cover the actual additional "soft costs" incurred by the Insured during the **PERIOD OF INDEMNITY** arising out of the delay in substantial completion of buildings and additions under construction directly resulting from direct physical loss or damage by a peril insured by this Policy to insured property under construction at Insured Location(s).

E. **PERIOD OF INDEMNITY**

1. The **PERIOD OF INDEMNITY** applying to all **TIME ELEMENT** coverages, except **GROSS PROFITS** and **LEASEHOLD INTEREST** and as shown below or if otherwise provided under any **TIME ELEMENT COVERAGE EXTENSION**, and subject to any Time Limit provided in the **POLICY DECLARATIONS** section, is as follows:

2. For building and equipment, the period:

   a. starting from the time of direct physical loss or damage by a peril insured by this Policy; and

   b. ending when with due diligence and dispatch the building and equipment could be:

      (1) repaired or replaced; and

      (2) made ready for operations,

   under the same or equivalent physical and operating conditions that existed prior to the direct physical loss or damage.

   not to be limited by the expiration of this Policy.

3. For building and equipment under construction:

   a. The necessary delay in substantial completion of construction caused by the direct physical loss or damage by a peril insured by this Policy, measured by the date that substantial completion would have been achieved if the direct physical loss or damage to insured property had not occurred and the date that substantial completion was, or with due diligence and dispatch could have been, achieved following the direct physical loss or damage. All other factors that cause or contribute to any delay in completion of construction other than the direct physical loss or damage shall be excluded from the **PERIOD OF INDEMNITY**.

 © 2019 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

    b. Due consideration will be given to the actual experience of the business following substantial completion of the construction and use and occupancy or startup.

4. For "stock in-process" and mercantile stock, including "finished goods" not manufactured by the insured, the time required with the exercise of due diligence and dispatch:

    a. to restore "stock in process" to the same state of manufacture in which it stood at the inception of the interruption of production or suspension of business operations or services; and

    b. to replace physically damaged mercantile stock.

This item does not apply to **RENTAL INSURANCE**.

5. For "raw stock" and supplies, the period of time:

    a. of necessary interruption of production or suspension of operations or services while, with due diligence and dispatch, suitable replacement "raw stock" are obtained; but

    b. limited to that period of time for which the damaged "raw stock" would have supplied operating needs.

6. If water:

    a. used for any manufacturing purpose, including but not limited to as a raw material or for power;

    b. stored behind dams or in reservoirs; and

    c. on any Insured Location(s),

is released as the result of direct physical loss or damage by a peril insured by this Policy to such dam, reservoir or connected equipment, the Company's liability for the actual interruption of production or suspension of operations or services due to inadequate water supply will not extend beyond thirty (30) consecutive days after the damaged dam, reservoir or connected equipment has been repaired or replaced.

This item does not apply to **RENTAL INSURANCE**.

7. For physically damaged exposed films, records, manuscripts and drawings, the time required to copy from backups or from originals of a previous generation. This time does not include research, engineering or any other time necessary to restore or recreate lost information.

This item does not apply to **RENTAL INSURANCE**.

8. For physically damaged or destroyed property covered under "electronic data processing equipment" and "electronic data", the time to recreate or restore including the time for researching or engineering lost information.

This item does not apply to **RENTAL INSURANCE**.

9. The **PERIOD OF INDEMNITY** applying to **GROSS PROFITS** is as follows:

    a. The period:

        (1) starting from the time of physical loss or damage to property insured under this Policy by a peril insured by this Policy; and

        (2) ending not later than the period of time shown in the **POLICY DECLARATIONS** section, during which period the results of the business shall be directly affected by such damage, not to be limited by the expiration of this Policy.

    b. For property under construction, the period:

        (1) starting on the date that production, business operation or service would have commenced if insured physical damage had not happened; and

        (2) ending not later than the period of time shown in the **POLICY DECLARATIONS** section,

© 2019 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

during which period the results of the business shall be directly affected by such damage, not to be limited by the expiration of this Policy.

(1) the "rate of gross profit" and "standard sales" will be based on the experience of the business after construction is completed and the probable experience during the **PERIOD OF INDEMNITY.**

(2) The **PERIOD OF INDEMNITY** does not include any additional time due to the Insured's inability to resume operations for any reason, including but not limited to:

  (i) making changes to equipment.

  (ii) making changes to the buildings or structures except as provided in the **DEMOLITION AND INCREASED COST OF CONSTRUCTION.**

  (iii) restaffing or retraining employees.

c. If two or more **PERIODS OF INDEMNITY** apply such periods will not be cumulative.

POLICY NUMBER: US00128761PR23A

**F. SCHEDULE OF CONTINGENT TIME ELEMENT LOCATIONS**

| Names of Supplier or Customer | Address |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

## SECTION IV. EQUIPMENT BREAKDOWN COVERAGE EXTENSION

This Policy is extended to cover Direct physical loss or damage to Insured Equipment and the resulting **TIME ELEMENT** loss as provided by this Policy, if such loss or damage is caused by a sudden and accidental Breakdown of Insured Equipment or a part thereof, which manifests itself by direct physical loss or damage at the time of its "occurrence" and necessitates repair or replacement.

All Breakdowns at any one Insured Location that occur at the same time and are the result of the same cause will be considered one Breakdown.

a. The following is defined for purposes of this coverage extension

  (1) A Breakdown means:

    a. Failure of pressure or vacuum equipment;

    b. Electrical failure including arcing; or

    c. Mechanical failure including rupture or bursting caused by centrifugal force.

      Including explosion to a steam boiler, electric steam generator, steam piping, steam turbine, steam engine, gas turbine, or moving or rotating machinery when such explosion is caused by centrifugal force or mechanical failure; but not the explosion of gases or fuel within the furnace of any Insured Equipment or within the flues or passages through which the gases of combustion pass; nor combustion explosion outside the Insured Equipment.

  (2) A Breakdown does not mean or include:

    (i) Malfunction including but not limited to adjustment, alignment, calibration, cleaning or modification;

    (ii) Defects, erasures, errors, limitations or virus in computer equipment and programs;

    (iii) Leakage at any valve, fitting, shaft seal, gland packing, joint or connection;

    (iv) Damage to any vacuum tube, gas tube or brush;

    (v) Damage to any structure or foundation supporting any Insured Equipment or any of its parts;

    (vi) Functioning of any safety or protective device;

    (vii) Cracking of any part on an internal combustion gas turbine exposed to the products of combustion; or

    (viii) deterioration, depletion, rust, corrosion, rapid corrosion or erosion, inherent vice or latent defect, wear and tear;

  (3) Insured Equipment is defined for purposes of this coverage extension as:

    (i) Any boiler fired pressure vessel, unfired vessel normally subject to vacuum or internal pressure other than weight of its contents, refrigerating and air conditioning systems, any metal piping and its accessory equipment, and mechanical, or electrical machines or apparatus used for the generation, transmission, or utilization of mechanical or electrical power, not otherwise excluded as Insured Property.

    (ii) Insured Equipment does not include any of the following:

      (i) Any part of pressure or vacuum equipment that is not under internal pressure of its contents or internal vacuum;

      (ii) Insulating or refractory material, but not excluding the glass lining of any Insured Equipment;

(iii) Non-metallic pressure or vacuum equipment unless its constructed and used in accordance with the American Society of Mechanical Engineers (ASME) code or another appropriate and approved code;

(iv) Catalyst;

(v) Vessels, piping and other equipment that is buried below ground and requires the excavation of materials to inspect, remove, repair or replace;

(vi) Vehicle, aircraft, self-propelled equipment or floating vessel including any Insured Property (equipment) that is mounted upon or used solely with any one or more vehicle(s), aircraft, self-propelled equipment or floating vessel;

(vii) Drag-line, excavation or construction equipment including any Insured Property or Insured Equipment that is mounted upon or used solely with any one or drag-line(s), excavation, or construction equipment;

(viii) Felt, wire, screen, die, extrusion plate, swing hammer, grinding disc, cutting blade, non-electrical cable, chain, belt, rope, clutch plate, brake pad, non-metal part or any part or tool subject to periodic replacement;

(ix) Equipment or any part of such equipment manufactured by the Insured for sale.

b. This coverage extension is further extended to include the following, for which the sublimits (if any) shown in the **POLICY DECLARATIONS** are a part of and not in addition to any EQUIPMENT BREAKDOWN sublimit:

(1) Ammonia Contamination: In the event of direct physical loss or damage to Insured Property caused by a breakdown of Insured Equipment at an Insured Location, this Policy covers the loss or damage, including salvage expense, caused by ammonia contacting or permeating Insured Property under refrigeration or in process requiring refrigeration.

(2) Expediting Expense: In the event of direct physical loss or damage to Insured Property caused by a breakdown of Insured Equipment at an Insured Location, this Policy covers the reasonable and necessary additional expenses incurred by the Insured to expedite permanent repair or replacement of such damaged property.

(3) Hazardous Substances: In the event of direct physical loss or damage to Insured Property caused by a breakdown of Insured Equipment at an Insured Location, this Policy such Insured Property damaged by or contaminated with a substance (other than ammonia) declared by an authorized governmental agency to be hazardous to health and the additional expenses incurred by the Insured for the cleanup, repair, replacement or disposal of damaged or contaminated property.

(4) Spoilage: In the event of direct physical loss or damage to Insured Property caused by a breakdown of Insured Equipment at an Insured Location, this Policy covers the loss or damage to property due to spoilage caused by lack of power, light, heat, steam or refrigeration resulting solely from a breakdown of Insured Equipment.

(5) Water Damage: In the event of direct physical loss or damage to Insured Property caused by a breakdown of Insured Equipment at an Insured Location, this Policy such Insured Property damaged by water, including salvage expense.

Coverage provided under this extension is subject to the Sublimits and Deductibles specified in the **POLICY DECLARATIONS** section of this Policy.

POLICY NUMBER: US00128761PR23A

## SECTION V. LOSS ADJUSTMENT AND SETTLEMENT

### A. LOSS ADJUSTMENT AND LOSS PAYABLE

Loss, if any, will be adjusted with and payable to the First Named Insured as listed on the **POLICY DECLARATIONS** or as may be directed by the First Named Insured.

### B. LOSS CONDITIONS

1.  **ABANDONMENT**

    There may be no abandonment of any property to the Company**.**

2.  **APPRAISAL**

    If the Insured and the Company fail to agree on the amount of loss, either may demand appraisal to resolve the dispute concerning the amount of loss.  Each will, on the written demand of either, select a competent and disinterested appraiser after:

    a.   the Insured has fully complied with all provisions of this Policy, including **REQUIREMENTS IN CASE OF LOSS**; and

    b.   the Company has received a signed and sworn proof of loss from the Insured.

    Each will notify the other of the appraiser selected within twenty (20) days of such demand.

    The appraisers will first select a competent and disinterested umpire. If the appraisers fail to agree upon an umpire within thirty (30) days then, on the request of the Insured or the Company, the umpire will be selected by a judge of a court of record in the jurisdiction in which the appraisal is pending.  The appraisers will then appraise the amount of loss, stating separately the "actual cash value" and "replacement value" as of the date of loss and the amount of loss, for each item of physical loss or damage or if, for **TIME ELEMENT** loss, the amount of loss for each **TIME ELEMENT** coverage of this Policy.

    If the appraisers fail to agree, they will submit their differences to the umpire.  An award agreed to in writing by any two will determine the amount of loss.

    The Insured and the Company will each:

    a.   pay its chosen appraiser; and

    b.   bear equally the other expenses of the appraisal and umpire.

    A demand for **APPRAISAL** shall not relieve the Insured of its continuing obligation to comply with the terms and conditions of this Policy, including as provided under **REQUIREMENTS IN CASE OF LOSS.**

    The Company will not be held to have waived any of its rights by any act relating to appraisal.

3.  **ASSIGNMENT**

    Assignment of this Policy or any claim hereunder is not valid except with written consent of the Company.

4.  **COLLECTION FROM OTHERS**

    The Company will not be liable for any loss to the extent that the Insured has collected for such loss from others.

5.  **COMPANY OPTION**

The Company has the option to take all or any part of damaged property at the agreed or appraised value within a reasonable time.

The Company must give notice to the insured of its intention to do so within thirty (30) consecutive calendar days after receipt of the signed and sworn to proof of loss required by the Policy.

6.  **CHOICE OF LAW**

This Policy is governed by the laws of the State of New York. Any disputes arising hereunder will be exclusively subject to the law of the State of New York.

7.  **PARTIAL PAYMENT OF LOSS SETTLEMENT**

In the event of a loss occurring which has been ascertained to be insured loss or damage under this Policy and determined by the Company's representatives to be in excess of the applicable Policy deductible(s), the Company will advance mutually agreed upon partial payment(s) on the insured loss or damage, subject to the Policy's provisions.  To obtain said partial payments, the Insured will submit a signed and sworn partial Proof of Loss as described in this Policy, with adequate supporting documentation.

8.  **REQUIREMENTS IN CASE OF LOSS**

The Insured will:

a.  give written notice to the Company of having knowledge of any loss as soon as reasonably possible;

b.  take reasonable measures to protect the property from further loss or damage;

c.  promptly separate the damaged and undamaged property; put it in the best possible order; and furnish a complete inventory of the lost, destroyed, damaged and undamaged property showing in detail the quantities, costs, "actual cash value" or "replacement value" as applicable and amount of loss claimed;

d.  give a signed and sworn proof of loss to the Company as soon as practicable after the loss.  The proof of loss must state the knowledge and belief of the Insured as to:

(1)  the time and origin of the loss;

(2)  the Insured's interest and that of all others in the property;

(3)  the "actual cash value" or "replacement value" as applicable of each item and the amount of loss to each item; all encumbrances; and all other contracts of insurance, whether valid or not, covering any of the property;

(4)  any changes in the title, use, occupation, "location", possession or exposures of the property since the effective date of this Policy;

(5)  by whom and for what purpose any "location" insured by this Policy was occupied on the date of loss, and whether or not it then stood on leased ground.

e.  include a copy of all the descriptions and schedules in all policies and, if required, provide verified plans and specifications of any buildings, fixtures, machinery or equipment destroyed or damaged;

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

   f.   further, the Insured, will as often as may be reasonably required:

      (1)  exhibit to any person designated by the Company all that remains of any property;

      (2)  submit to examination under oath by any person designated by the Company and sign the written records of examinations; and

      (3)  produce for examination at the request of the Company:

         (i)  all books of accounts, business records, bills, invoices and other vouchers; or

         (ii)  certified copies if originals are lost, at such reasonable times and places that may be designated by the Company or its representative and permit extracts and machine copies to be made.

9.  **SALVAGE AND RECOVERY**

Any salvage or other recovery, except recovery under **SUBROGATION** or **OTHER INSURANCE**, will accrue entirely to the benefit of the Company until the sum paid by the Company is recovered.

10.  **SETTLEMENT OF CLAIMS**

The amount of loss, for which the Company may be liable will be paid within thirty (30) days after:

   a.  proof of loss as described in this Policy is received by the Company; and

   b.  when a resolution of the amount of loss is made either by:

      (1)  written agreement between the Insured and the Company; or

      (2)  the filing with the Company of an award as provided in the **APPRAISAL** clause of this section.

11.  **SUBROGATION**

The Insured is required to cooperate in any subrogation proceedings.  The Company may require from the Insured an assignment or other transfer of all rights of recovery against any party for loss to the extent of the Company's payment.

The Company will not acquire any rights of recovery that the Insured has expressly waived prior to a loss, nor will such waiver affect the Insured's rights under this Policy.

Any recovery from subrogation proceedings, less costs incurred by the Company in such proceedings, will be payable to the Insured in the proportion that the amount of:

   a.  any applicable deductible; and/or

   b.  any provable uninsured loss,

bears to the entire provable loss amount.

12.  **SUIT AGAINST THE COMPANY**

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless:

   a.  the Insured has fully complied with all the provisions of this Policy; and

   b.  legal action is started within twelve (12) months of the date of direct physical loss or damage providing the basis for any claim under this Policy.

POLICY NUMBER: US00128761PR23A

If under applicable insurance law or regulation such twelve (12) months' limitation is invalid, then any such legal action needs to be started within the shortest period of time permitted by such laws.

**C. VALUATION**

Adjustment of the direct physical loss or damage amount under this Policy will be computed as of the date of loss at the Insured Location(s) of the loss, and for no more than the interest of the Insured, subject to the following:

1. On **"stock in process"**, the value of "raw stock" and labor expended plus the proper proportion of overhead charges invested in the **"Stock in Process"** as of the date of loss.

2. On "finished goods" manufactured or sold by the insured, the regular cash selling price at the "location" where the loss occurred, less all discounts and charges to which the "finished goods" would have been subject had no loss occurred.

3. On "raw stock", supplies and other "merchandise" not manufactured by the Insured:

    a. if repaired or replaced, the reasonable and necessary expenditure incurred in repairing or replacing the damaged or destroyed property; or

    b. if not repaired or replaced, the "actual cash value".

4. On exposed films, records, manuscripts and drawings, that are not "valuable papers and records", the value blank plus the cost of copying information from back-up or from originals of a previous generation. These costs will not include research, engineering or any costs of restoring or recreating lost information.

5. On property covered under **DEFERRED PAYMENTS**, the lesser of the:

    a. Total amount of unpaid installments less finance charges.

    b. "actual cash value" of the property at the time of loss.

    c. Cost to repair or replace with material of like size, kind and quality.

6. On **FINE ARTS**, the lesser of:

    a. The reasonable and necessary cost to repair or restore such property to the physical condition that existed on the date of loss;

    b. Reasonable and necessary cost to replace the article;

    c. The value, if any, stated on a schedule on file with the Company;

    d. The stated appraisal value; or

    e. Market value at time of loss.

    In the event a "fine arts" article is part of a pair or set, and a physically damaged article cannot be replaced, or repaired or restored to the condition that existed immediately prior to the loss, the Company will be liable for the lesser of the full value of such pair or set or the amount designated on the schedule. The Insured agrees to surrender the pair or set to the Company. This Policy will not cover any diminution in value of any "fine arts" that remains following repair or restoration of such property to the physical condition that existed on the date of loss.

7. On property covered under **ELECTRONIC DATA PROCESSING EQUIPMENT AND ELECTRONIC DATA:**

    a. The reasonable and necessary cost to repair, replace or restore data, programs or software including the costs to create, research and engineer.

    b. If not repaired, replaced or restored within two (2) years from the date of loss, the blank value of the "media".

© 2019 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

8.  On **VALUABLE PAPERS AND RECORDS**, the lesser of the following:

    a.  The cost to repair or restore the item to the condition that existed immediately prior to the loss.

    b.  Reasonable and necessary cost to replace the item.

9.  On all other property, the loss amount will not exceed the reasonable and necessary lesser of the following:

    a.  The actual cost to repair or with property or materials of like size, kind and quality.

    b.  The cost to rebuild, repair or replace on the same site with new materials of like size, kind and quality.

    c.  The cost in rebuilding, repairing or replacing on the same or another site within two (2) years, but not to exceed the size and operating capacity that existed on the date of loss.

    d.  The selling price of personal property or machinery and equipment, other than stock, offered for sale on the date of loss.

    e.  The cost to replace unrepairable electrical or mechanical equipment, including computer equipment, with equipment that is the most functionally equivalent to that damaged or destroyed, even if such equipment has technological advantages and/or represents an improvement in function and/or forms part of a program of system enhancement.

    f.  The increased cost of demolition, if any, resulting from loss covered by this Policy, if such property is scheduled for demolition.

    g.  The unamortized value of improvements and betterments, if such property is not repaired or replaced at the Insured's expense.

    h.  The "actual cash value" if such property is:

        (1)  useless to the Insured or obsolete as of the date of loss; or

        (2)  if the repair, replacement or rebuilding on the same or another site is not commenced within two (2) years from the date of loss.

The Insured may elect not to repair or replace the insured real and/or personal property lost, damaged or destroyed.  Loss settlement may be elected on the lesser of "replacement value" basis if the proceeds of such loss settlement are expended on other capital expenditures related to the Insured's operations within two (2) years from the date of loss. As a condition of collecting under this item, such expenditure must be unplanned as of the date of loss and be made at Insured Location(s) under this Policy. This item does not extend to **DEMOLITION AND INCREASED COST OF CONSTRUCTION.**

 © 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

POLICY NUMBER: US00128761PR23A

## SECTION VI. GENERAL CONDITIONS

### A. LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS

1. The Company will pay for loss to specified property insured under this Policy to each specified Lender Loss Payee (hereinafter referred to as Lender) as its interest may appear, and to each specified Mortgagee as its interest may appear, under all present or future mortgages upon such property, in order of precedence of the mortgages.

2. The interest of the Lender or Mortgagee (as the case may be) in property insured under this Policy will not be invalidated by:

   a. any act or neglect of the debtor, mortgagor, or owner (as the case may be) of the property;

   b. foreclosure, notice of sale, or similar proceedings with respect to the property;

   c. change in the title or ownership of the property; or

   d. change to a more hazardous occupancy.

   The Lender or Mortgagee will notify the Company of any known change in ownership, occupancy, or hazard and, within ten (10) days of written request by the Company, may pay the increased premium associated with such known change. If the Lender or Mortgagee fails to pay the increased premium, all coverage under this Policy will cease.

3. If this Policy is cancelled at the request of the Insured or its agent, the coverage for the interest of the Lender or Mortgagee will terminate ten (10) days after the Company sends to the Lender or Mortgagee written notice of cancellation, unless:

   a. sooner terminated by authorization, consent, approval, acceptance, or ratification of the Insured's action by the Lender or Mortgagee, or its agent; or

   b. this Policy is replaced by the Insured, with a policy providing coverage for the interest of the Lender or Mortgagee, in which event coverage under this Policy with respect to such interest will terminate as of the effective date of the replacement policy, notwithstanding any other provision of this Policy.

4. The Company may cancel this Policy and/or the interest of the Lender or Mortgagee under this Policy, by giving the Lender or Mortgagee written notice sixty (60) days prior to the effective date of cancellation, if cancellation is for any reason other than non-payment. If the debtor, mortgagor, or owner has failed to pay any premium due under this Policy, the Company may cancel this Policy for such non-payment, but will give the Lender or Mortgagee written notice ten (10) days prior to the effective date of cancellation. If the Lender or Mortgagee fails to pay the premium due by the specified cancellation date, all coverage under this Policy will cease.

5. The Company has the right to invoke this Policy's **SUSPENSION** clause. The suspension of insurance will apply to the interest of the Lender or Mortgagee in any machine, vessel, or part of any machine or vessel, subject to the suspension. The Company will provide the Lender or Mortgagee at the last known address a copy of the suspension notice.

6. If the Company pays the Lender or Mortgagee for any loss, and denies payment to the debtor, mortgagor or owner, the Company will, to the extent of the payment made to the Lender or Mortgagee be subrogated to the rights of the Lender or Mortgagee under all "securities" held as collateral to the debt or mortgage. No subrogation will impair the right of the Lender or Mortgagee to sue or recover the full amount of its claim. At its option, the Company may pay to the Lender or Mortgagee the whole principal due on the debt or mortgage plus any accrued interest. In this event, all rights and "securities" will be assigned and transferred from the Lender or Mortgagee to the Company, and the remaining debt or mortgage will be paid to the Company.

7. If the Insured fails to render proof of loss, the Lender or Mortgagee, upon notice of the Insured's failure to do so, will render proof of loss within sixty (60) days of notice and will be subject to the provisions of this Policy relating to **APPRAISAL**, **SETTLEMENT OF CLAIMS**, and **SUIT AGAINST THE COMPANY.**

8. Other provisions relating to the interests and obligations of the Lender or Mortgagee may be added to this Policy by agreement in writing.

## B. CERTIFICATES OF INSURANCE

1. The Company hereby authorizes the producer of the First Named Insured's account to issue Certificates of Insurance including any mortgagee, lenders loss payee, loss payee or additional insured. Any producer authorized to prepare any certificates is not the agent of the Company and is responsible for any errors in them.

2. Any Certificate of Insurance issued in connection with this Policy shall be issued solely as a matter of convenience or information for the addressee(s) or holder(s) of said Certificate of Insurance, except as provided under the Policy when a mortgagee, lenders loss payee, loss payee or additional insured is named. The certificate does not amend, extend or alter the terms, conditions, provisions and limits of this Policy.

## C. CANCELLATION AND NON-RENEWAL

This Policy may be:

1. cancelled at any time at the request of the Insured by surrendering this Policy to the Company or by giving written notice to the Company stating when such cancellation will take effect; or

2. cancelled by the Company by giving the Insured not less than:

   a. ninety (90) days written notice of cancellation; or

   b. ten (10) days written notice of cancellation if the Insured fails to remit, when due, payment of premium for this Policy; or

3. non-renewed by the Company by giving the Insured not less than ninety (90) days written notice of non-renewal.

## D. INSPECTIONS

1. The Company has the right but not the obligation to make inspections and surveys at any time, to give the Insured reports on the conditions found, and to recommend changes.

2. Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. The Company does not make safety inspections. The Company does not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public, nor does it represent that conditions are safe, healthful, or comply with laws, regulations, codes or standards.

3. The Company does not waive any rights, terms, conditions, provisions, or exclusions of this Policy by performing inspections.

## E. LIBERALIZATION

If any filed rules or regulations in the fifty (50) states of the United States and the District of Columbia affecting this Policy are amended by statute during the **POLICY PERIOD** so as to broaden the coverage without additional premium charge, such extended or broadened coverage will inure to the benefit of the Insured within such jurisdiction, effective on the date of the amendment specified in such statute.

### F.  MISREPRESENTATION AND FRAUD

This Policy is void if, whether before or after the loss, the Insured has:

1.  willfully concealed or misrepresented any material fact or circumstance concerning this insurance, the subject thereof, any insurance claim, or the interest of an Insured; or

2.  made any attempt to defraud the Company.

### G.  OTHER INSURANCE

1.  If there is any other, more specific, insurance that would apply in the absence of this Policy, this Policy will act as excess insurance coverage and will apply only after the limits of the other such insurance whether collectible or not.

2.  The Insured is permitted to have other insurance over any limits or sub limits of liability specified elsewhere in this Policy without prejudice to this Policy.  The existence of any such insurance will not reduce any limit or sub limit of liability in this Policy.

3.  The Insured is permitted to have other insurance for all, or any part, of any deductible in this Policy. The existence of such other insurance will not prejudice recovery under this Policy.  If the limits of liability of such other insurance are greater than this Policy's applicable deductible, this Policy's insurance will act as excess insurance coverage and will apply only after the limits of such other insurance have been exhausted.

4.  If there is any other insurance that would apply in the absence of this Policy, and which insurance is not more specific than the Policy, this Policy will act as excess insurance coverage and will apply only after the limits of the other such insurance whether collectible or not.

5.  National Flood Insurance Program: This Policy shall respond as excess over the terms and conditions concurrent with the standard Flood Insurance Policy issued to the Insured or available to the Insured prior to the date of loss, whether issued to the Insured or not or collectible or not, and its renewal or replacement thereof.

### H.  PROVISIONS APPLICABLE TO JURISDICTIONS

If the provisions of this Policy conflict with the laws of any jurisdictions in which this Policy applies, and if certain provisions are required by law to be stated in this Policy, this Policy will be read so as to eliminate such conflict or deemed to include such provisions for Insured Location(s) within such jurisdictions.

The Company will provide to the Insured copies of endorsements mandated for use by the laws of states in the United States of America. The endorsements may modify this Policy with respect to any insured property located in the state in which the endorsement applies.

### I.  POLICY MODIFICATION

This Policy contains all of the agreements between the Insured and the Company concerning this insurance.  The Insured and the Company may request changes to this Policy. This Policy can be changed only by endorsements issued by the Company and made a part of this Policy.

Notice to any agent or knowledge possessed by any agent or by any other person will not:

1.  create a waiver, or change any part of this Policy; or

2.  prevent the Company from asserting any rights, terms, conditions, provisions, or exclusions under the provisions of this Policy.

**J. REDUCTION BY LOSS**

Claims paid under this Policy will not reduce its limit of liability, except claims paid will reduce any aggregated Limits of Liability as listed in the **POLICY DECLARATIONS**.

**K. SUSPENSION**

The Insured shall advise the Company in writing immediately upon discovery of a dangerous condition with respect to any boiler, fired or unfired vessel, refrigerating or air conditioning system, piping and its accessory equipment and any mechanical or electrical machine or apparatus used for the generation, transmission or utilization of mechanical or electrical power, which may result in loss or damage if not corrected.

Upon receipt of that advice or discovery of the condition through other means, the Company may, at its discretion, immediately suspend the insurance with respect to such loss or damage to such property by written notice mailed or delivered to the Insured at the address of the Insured, or at the "location" of the property, or as otherwise specified in this Policy. Insurance so suspended may be reinstated by the Company, but only by a duly authorized written endorsement issued to form a part hereof. The Insured shall be allowed the unearned portion of the premium paid for such suspended insurance, pro rata, for the period of suspension.

**L. TITLES**

The titles in the Policy are only for reference. The titles do not in any way affect the provisions of this Policy.

## SECTION VII. DEFINITIONS

The following definitions apply:

1. "Actual Cash Value" means:

    The cost to repair, rebuild or replace the lost or damaged property, at the time and place of the loss, with new property of comparable size, kind and quality, less allowance for physical deterioration, depreciation, obsolescence and depletion.

2. "Actual Daily Value" means:

    The total one hundred percent (100%) **TIME ELEMENT** value for the **PERIOD OF INDEMNITY** divided by the number of working days in such period. The one hundred percent (100%) **TIME ELEMENT** value shall be the total amount exposed and not the amount of loss actually sustained during the period of interruption.

3. "Collapse" means:

    The abrupt falling down or caving in of a building or any part of a building.

4. "Commissions" means:

    The income that would have been received by the Insured from the sale of goods not owned by the Insured.

5. "Computer Virus" means:

    A set of corrupting, harmful or otherwise unauthorized instructions or code including a set of maliciously introduced unauthorized instructions or code, programmatic or otherwise, that propagate themselves through a computer system or network of whatsoever nature. Computer virus includes but is not limited to Trojan Horses, worms and time or logic bombs.

6. "Contamination" means:

    Any condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, asbestos, lead, fungus, mold or mildew.

7. "Contaminants" means:

    Anything that causes "contamination".

8. "Contingent **TIME ELEMENT** Location(s)" means any location:

    a)  Of a direct customer, supplier, contract manufacturer or contact services provider to the Insured; or

    b)  Of any company under a royalty, licensing fee or "commission" agreement with the Insured.

    However, contingent **TIME ELEMENT** location(s) do not include location(s) of any company directly or Indirectly supplying to, or receiving from, the Insured, electricity, fuel, gas, water, steam, refrigeration, sewage, voice, data or video.

9. "Electronic Data" means:

    Any information, data or software which is recorded or stored on magnetic tape, media cards, discs, drums and other storage devices used by "electronic data processing equipment".

 © 2019 X.L. America, Inc.  All Rights Reserved.<br>May not be copied without permission.

10. "Electronic Data Processing Equipment" means:

Computing equipment, computer networks, integrated circuits, microprocessors, computer operating systems, processing units, terminals, tape drives, disk drives, controllers, printers and other electronic equipment capable of receiving, processing, storing or retrieving "electronic data".

11. "Earth Movement" means:

Any natural or man-made earth movement including, but not limited to, earthquake, volcanic eruption, subsidence, sinkhole, mudslide, mudflow or landslide.

However, physical damage by fire, explosion, "sprinkler leakage" or "flood" resulting from earth movement will not be considered to be loss by earth movement within the terms and conditions of this Policy.

12. "Fine Arts" means:

Paintings, etchings, pictures, tapestries, rare or art glass, art glass windows, valuable rugs, statuary sculptures, antique furniture, bric-a-brac, porcelains, and similar property of rarity, historical value or artistic merit.

Fine arts do not include automobiles, coins, stamps, furs, jewelry, precious metals, precious stones, semi-precious stones, watercraft or aircraft, unless such item is specifically declared to and on file with the Company as fine arts prior to the physical loss or damage.

13. "Finished Goods" means:

Stock manufactured by the Insured which is ready for packing, shipment or sale.

14. "Fixed Charges" means:

All necessary continuing expenses, not operating expenses, of the business property sustaining **TIME ELEMENT** loss from direct physical loss or damage, unless specifically excluded herein.

15. "Flexa" meaning:

Fire, lightning, explosion, aircraft impact or impact from an object dropped therefrom;

16. "Flood" means:

Surface waters; rising waters; storm surge; sea surge; wave wash; waves; tsunami; tide or tidal water; the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray there from; or sewer back-up resulting from any of the foregoing;

However, physical damage by fire, explosion or "sprinkler leakage" resulting from flood is not considered to be loss by flood within the terms and conditions of this Policy.

17. "Gross Earnings" means:

    a)  As respects:

        i.  Manufacturing operations: the net sales value of lost production less the cost of all "raw stock", materials and supplies used in such production; or

        ii.  Mercantile or non-manufacturing operations: the total lost net "sales" less cost of "merchandise" sold, materials and supplies consumed in the operations or services rendered by the insured.

    b)  All other earnings derived from the operations of the business.

    Any amount recovered under the **PROPERTY DAMAGE** coverage provisions of this Policy at selling price for loss or damage to "merchandise" will be considered to have been sold to the Insured's regular customers and will be credited against any recovery that otherwise would have been available under the TIME ELEMENT provisions of this Policy.

18. "Gross Profit" means:

The amount produced by adding to the "net profit" the amount of the insured "fixed charges", or if there is no "net profit" the amount of the insured "fixed charges" less that proportion of any loss from business operations as the amount of the insured "fixed charges" bears to all "fixed charges".

19. "High Hazard Flood Zones" means:

    a)  The geographical area, specifically designated as a Special Flood Hazard Area on a Flood Insurance Rate Map by the Federal Insurance and Mitigation Administration (FIMA). Special Flood Hazard Areas shall mean the areas of a flood insurance rate map identified as zones A, AO, AH, A1-A30, AE, A99, AR, AR/A, AR/AE, AR/A1-A30, AR/AH, AR/AO, V, V1-V30, and VE; or

    b)  Any geographical area, which in the past one hundred (100) years has been subjected to "flood", regardless of whether (a) the building or structure existed at the time of the flooding; (b) any physical loss or damage occurred; or (c) any claim for damage or loss was ever filed; or

    c)  Any geographical area, that is partially or totally protected by dams, dikes, levees or walls which are intended to protect property from the level of a one hundred (100) year "flood" or its worldwide equivalent, regardless of any Zone or Area designation or assignment by Federal Insurance and Mitigation Administration (FIMA) or other recognized authority having jurisdiction; or

If any part of a "location" is within a high hazard flood zone, then such "location" is considered to be entirely within a high hazard flood zone.

20. "Landslide or Subsidence" means:

Direct physical damage caused by or resulting from the sudden collapse or shifting of land.

21. "Lease Interest" means:

The excess rent paid for the same or similar replacement property over the actual rent that was being paid at the damaged premises plus cash bonuses or advance rent paid (including maintenance or operating charges) for each month during the unexpired term of the Insured's cancelled lease.

22. "Location" means:

Insured premises made up of an insured building or group of buildings situated at a common place, including machinery and equipment, related structures and the contents of such buildings or structures, or on land within one thousand (1,000) feet thereof.

23. "Media" means:

Tangible personal property on which "electronic data" can be recorded, but not the "electronic data" itself. "money", "securities", or "valuable papers and records" are not media**.**

24. "Merchandise" means:

Goods kept for sale by the insured which are not "raw stock", "stock in process" or "finished goods".

25. "Miscellaneous Unnamed Location(s)" means:

Any "location" within the **POLICY TERRITORY** that is either:

a) Not listed on the latest schedule submitted to and on file with the Company; or

b) Listed on the latest schedule submitted to and on file with the Company but for which the Insured has not submitted values for its interest.

26. "Moderate Hazard Flood Zones" means:

a) The geographical area, identified as Zones B or X-shaded as designated on a Flood Insurance Rate Map by the Federal Emergency Management Agency; or

b) Any geographical area, which in the past five hundred (500) years, have been subjected to "flood", regardless of whether (a) the building or structure existed at the time of the flooding; (b) any physical loss or damage occurred; or (c) any claim for damage or loss was ever filed:

Regardless of any Zone or Area designation or assignment by Federal Emergency Management Agency or other recognized authority having jurisdiction, Moderate Hazard Flood Zone does not include any geographical area that is partially or totally protected by dams, dikes, levees or walls which are intended to protect such property from the level of a one hundred (100) year "flood" or its worldwide equivalent.

"Locations" which are partially or wholly within a moderate hazard flood zone and not partially or wholly within a "high hazard flood zone" are considered to be entirely within the "moderate hazard flood zone".

If any part of a "location" is within a moderate hazard flood zone then such location is considered to be entirely within a moderate hazard flood zone, unless any part of such location is also within a "high hazard flood zone", in which case such location is considered to be entirely within a "high hazard flood zone".

27. "Money" means:

Bank notes, coins, currency, money orders held for sale to the public, traveler's checks or registered checks.

28. "Named Storm" means:

A weather or atmospheric condition that has been declared as a hurricane, typhoon, tropical storm or cyclone at any time by the U.S. National Weather Service, U.S. National Oceanic and Atmospheric Administration (NOAA), National Hurricane Center or any comparable worldwide equivalent.

However, physical loss or damage caused by fire, explosion, "sprinkler leakage" or "flood" resulting from named storm is not considered to be a named storm loss within the terms and conditions of this Policy.

The term encompasses the entirety of any such weather event and/or atmospheric condition, both physically and in duration (except as set forth above), and all without regard to the number of other perils or locations or coverages involved.

29. "Net Lease Interest" means:

That sum which placed at six percent (6%) interest rate compounded annually would equal the "Lease Interest" (less any amounts otherwise payable hereunder).

30. "Net Profit" means:

The net operating profit (exclusive of all capital receipts and accruals and all outlay properly chargeable to capital) resulting from the business of the Insured at the Insured Location(s) after due provision has been made for all "fixed charges" and other expenses including depreciation but before the deduction of any taxes on profits.

31. "Normal" means:

The condition that would have existed had no physical loss or damage occurred.

32. "Occurrence" means:

Loss, or a series of losses or several losses, which are attributable directly or indirectly to one cause or disaster or to one series of similar causes or disasters arising from a single event. All such losses shall be added together and the total amount of such losses shall be treated as one occurrence irrespective of the period of time or area over which such losses occur. for purposes of "earth movement", "flood", Windstorm, Hail or "named storm", all loss or damage caused by, resulting from, contributed to, or aggravated by the same "earth movement" and all aftershocks, "flood", Windstorm, Hail or "named storm" (or any combination thereof) during any period of seventy-two (72) consecutive hours shall be treated as one occurrence.

33. "Ordinary Payroll" means:

Payroll expenses for all employees except for officers, executives, department managers and employees under contract. Payroll expenses include the payroll, employee benefits (if directly related to payroll), FICA payments made by the Insured, Union dues paid by the Insured and premiums for Workers' Compensation.

34. "Period of Service Interruption" means:

The period starting with the time when an interruption of specific services occurs and ending when with due diligence and dispatch the service could be wholly restored.

a) The period of service interruption is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

b) The period of service interruption does not extend to include the interruption of operations caused by any reason other than interruption of the specified service(s).

  © 2019 X.L. America, Inc.  All Rights Reserved.<br>May not be copied without permission.

35. "Profits" means:

The amount that would have been received by the Insured from the sale of goods belonging to the Insured, in excess of the cost to the Insured of such goods.

36. "Rate of Gross Profit" means:

The rate of "gross profit" earned on the "sales" during the twelve (12) full calendar months immediately before the date of the physical loss or damage to the insured property.

37. "Raw Stock" means:

Materials in the state in which the insured received it to conversion into "stock in process" or "finished goods".

38. "Replacement Value" means:

The amount it would cost to repair, rebuild or replace lost or damaged Insured Property, at the time and place of loss, with new property of like size, kind and quality.

39. "Rolling Stock" means:

Any powered or unpowered conveyance not licensed for road use including but not limited to locomotives, railroad cars, coaches or wagons that move on a railway or tracks.

40. "Royalties" means:

The income the Insured is not able to collect under royalty or licensing agreements.

41. "Sales" means:

The money paid or payable to the Insured for goods sold and delivered and for services rendered in the conduct of the business at Insured Location(s).

42. "Securities" means:

All negotiable and non-negotiable instruments or contracts representing either "money" or other property including accounts, bills, food stamps, other evidences of debt or revenue, other stamps in current use, tokens, evidences of title and letter of credit.

43. "Sinkhole or Collapse" means:

Direct physical damage from the sudden sinking or collapse of any land into naturally occurring underground empty spaces created by the action of water on limestone or similar rock formation. coverage for sinkhole or collapse does not include the cost of filling sinkholes.

44. "Smoke Damage" means:

The sudden and accidental damage caused by or resulting from smoke.

 © 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

45. "Soft Costs" means:

Expenses which are necessarily incurred during the PERIOD OF INDEMNITY, that would not have been incurred if the delay in completion had not occurred, at location(s) undergoing renovation or in the course of construction, limited to the following:

a) Construction loan fees: The additional cost incurred to rearrange loans necessary for the completion of construction, repairs or reconstruction, including; the cost to arrange refinancing, accounting work necessary to restructure financing, legal work necessary to prepare new documents, charges by the lenders for the extension or renewal of loans necessary.

b) Commitment fees, leasing and marketing expenses: The cost of returning any commitment fees received from prospective tenant(s) or purchaser(s), the cost of re-leasing and marketing due to loss of tenant(s) or purchaser(s).

c) Additional fees: The additional fees for: architects, engineers, consultants, attorneys and accountants incurred because of the delay in completion.

d) Carrying costs: The additional: property taxes, building permits, additional interest on loans, realty taxes and insurance premiums incurred because of the delay in completion.

46. "Sonic Boom" means:

Direct physical damage caused by or resulting from a sonic wave emanating from an aircraft.

47. "Sprinkler Leakage" means:

Leakage or discharge of any substance from any part automatic sprinkler system including collapse of a tank that is part of such system.

48. "Standard Sales" means:

The "sales" during that period in the twelve (12) months immediately before the date of the physical loss or damage to the described property which corresponds with the PERIOD OF INDEMNITY.

49.  "Stock in Process" means:

"Raw stock" or material which has undergone any aging, seasoning, mechanical or other process of manufacture at Insured Location(s), but which has not become "finished goods".

50. "Terrorism" means:

Any act, including but not limited to the use of force or violence or the threat of thereof, of any person or groups of persons, whether acting alone or on behalf of or in connection with any organizations or governments, committed for political, religious, ideological or similar purposes or to seek revenge or retaliate with the intention to influence any government or to put the public, or any section of the public, in fear or to cause chaos among the civilian population or any segment thereof.

51. "Theft" means:

The illegal and unauthorized taking of Insured Personal Property at Insured Location(s).

 © 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

52. **"**Valuable Papers and Records" means:

Written, printed or otherwise inscribed documents and records, including books, maps, films, drawings, abstracts, deeds, mortgages and manuscripts, all of which must be of value to the insured. valuable papers and records do not include "media", "money" or "securities".

53. "Vacant" or "Unoccupied" means:

The Insured's building is vacant or unoccupied when it does not contain enough property to conduct its customary business operations.

54. "Vandalism" means:

The malicious destruction of Insured Property at Insured Location(s).

55. "Water Damage" means:

The sudden and accidental leakage or discharge of water or steam resulting from the breaking apart of plumbing, heating, air conditioning or any other system or appliance located at Insured Location(s).

## APPENDIX FOR EARTH MOVEMENT ZONES

**High Hazard And Moderate Hazard Earth Movement Zones**

| Country | Area | |
|---------|------|---|
| Puerto Rico | Entire Commonwealth | High Hazard |
| New Madrid | See New Madrid Seismic Zone Table | Moderate Hazard |
| Pacific Northwest Seismic Zone 1 | Washington State counties of: Chelan, Clallam, Clark, Cowlitz, Grays Harbor, Island, Jefferson, King, Kitsap, Kittitas, Lewis, Mason, Pacific, Pierce, San Juan, Skagit, Skamania, Snohomish, Thurston, Wahkiakum, Whatcom<br><br>Oregon, counties of: Benton, Clackamas, Clatsop, Columbia, Coos, Curry, Douglas, Jackson, Josephine, Klamath, Lake, Lane, Lincoln, Linn, Marion, Multnomah, Polk, Tillamook, Washington, Yamhill | High Hazard |
| Pacific Northwest Seismic Zone 2 | All remaining counties in Washington and Oregon | Moderate Hazard |
| Alaska, California, Hawaii | Entire State | High Hazard |
| Virgin Islands | All Islands | High Hazard |

**New Madrid Seismic Zone**

| U.S. State | Counties |
|------------|----------|
| Arkansas | Arkansas, Ashley, Chicot, Clay, Craighead, Crittenden, Cross, Desha, Drew, Fulton, Grant, Greene, Independence, Izard, Jackson, Jefferson, Lawrence, Lee, Lincoln, Lonoke, Mississippi, Monroe, Phillips, Poinsett, Prairie, Pulaski, Randolph, Saline, Sharp, St Francis, White, Woodruff |
| Illinois | Alexander, Bond, Calhoun, Christian, Clark, Clay, Clinton, Coles, Crawford, Cumberland, Edwards, Effingham, Fayette, Franklin, Gallatin, Greene, Hamilton, Hardin, Jackson, Jasper, Jefferson, Jersey, Johnson, Lawrence, Macoupin, Madison, Marion, Massac, Monroe, Montgomery, Morgan, Perry, Pike, Pope, Pulaski, Randolph, Richland, Saint Clair, Saline, Sangamon, Scott, Shelby, Union, Wabash, Washington, Wayne, White, Williamson |
| Indiana | Crawford, Daviess, Dubois, Gibson, Greene, Knox, Lawrence, Martin, Orange, Perry, Pike, Posey, Spencer, Sullivan, Vanderburgh, Warrick |

 © 2019 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

| U.S. State | Counties |
|---|---|
| Kentucky | Ballard, Breckenridge, Butler, Caldwell, Calloway, Carlisle, Christian, Crittenden, Daviess, Fulton, Graves, Hancock, Henderson, Hickman, Hopkins, Livingston, Logan, Lyon, Marshall, McCracken, McLean, Muhlenberg, Ohio, Simpson, Todd, Trigg, Union, Warren, Webster |
| Mississippi | Alcorn, Benton, Bolivar, Calhoun, Carroll, Chickasaw, Choctaw, Clay, Coahoma, De Soto, Grenada, Holmes, Humphreys, Issaquena, Itawamba, Lafayette, Lee, Leflore, Lowndes, Marshall, Monroe, Montgomery, Oktibbeha, Panola, Pontotoc, Prentiss, Quitman, Sharkey, Sunflower, Tallahatchie, Tate, Tippah, Tishomingo, Tunica, Union, Warren, Washington, Webster, Yalobusha, Yazoo |
| Missouri | Audrain, Bollinger, Butler, Callaway, Cape Girardeau, Carter, Cole, Crawford, Dent, Dunklin, Franklin, Gasconade, Howell, Iron, Jefferson, Lincoln, Madison, Maries, Marion, Miller, Mississippi, Montgomery, New Madrid, Oregon, Osage, Pemiscot, Perry, Phelps, Pike, Pulaski, Ralls, Reynolds, Ripley, St. Charles, St. Francois, Ste. Genevieve, St. Louis, St. Louis City, Scott, Shannon, Stoddard, Texas, Warren Washington, Wayne |
| Tennessee | Benton, Carroll, Cheatham, Chester, Crockett, Decatur, Dickson, Dyer, Fayette, Gibson, Hardeman, Hardin, Haywood, Henderson, Henry, Hickman, Houston, Humphreys, Lake, Lauderdale, Lawrence, Lewis, Madison, McNairy, Montgomery, Obion, Perry, Robertson, Shelby, Stewart, Tipton, Wayne, Weakley |

**APPENDIX FOR WIND ZONES**

**High Hazard Wind Zones**

| U.S. State | Counties / Areas |
|---|---|
| Alabama | Baldwin, Mobile |
| Florida | Entire State |
| Georgia | Brantley, Bryan, Camden, Chatham, Charlton, Effingham, Glynn, Liberty, Long, McIntosh, Wayne |
| Hawaii | Entire State |
| Louisiana | Parishes of: Acadia, Ascension, Assumption, Cameron, Calcasieu, East Baton Rouge, East Feliciana, Iberia, Iberville, Jefferson, Jefferson Davis, Lafayette, Lafourche, Livingston, Orleans, Plaquemines, Pointe Coupee, St. Bernard, St. Charles, St. James, St. John the Baptist, Saint Helena, St. Martin, St. Mary, St. Tammany, Tangipahoa, Terrebonne, Vermilion, Washington, West Baton Rouge, West Feliciana |
| Mississippi | George, Hancock, Harrison, Jackson, Pearl River, Stone |
| North Carolina | Beaufort, Bertie, Bladen, Brunswick, Camden, Carteret, Chowan, Columbus, Craven, Currituck, Dare, Duplin, Gates, Greene, Hertford, Hyde, Jones, Lenoir, Martin, New Hanover, Onslow, Pamlico, Pasquotank, Pender, Perquimans, Pitt, Sampson, Tyrrell, Washington, Wayne |
| South Carolina | Beaufort, Berkeley, Charleston, Colleton, Dorchester, Georgetown, Hampton, Horry, Jasper, Williamsburg |

POLICY NUMBER: US00128761PR23A

| U.S. State | Counties / Areas |
|---|---|
| Texas | Aransas, Bee, Brazoria, Brooks, Calhoun, Cameron, Chambers, Fort Bend, Galveston, Goliad, Hardin, Harris, Hidalgo, Jackson, Jasper, Jefferson, Jim Wells, Kenedy, Kleberg, Liberty, Live Oak, Matagorda, Newton, Nueces, Orange, Refugio, San Patricio, Victoria, Wharton, Willacy |
| **Country/ Territory** | **Counties / Areas** |
| U.S. Virgin Islands | Entire and all islands ) |
| Puerto Rico | Entire Commonwealth |

**Moderate Hazard Wind Zones**

| State/Country | Counties / Areas |
|---|---|
| Connecticut | Fairfield, Middlesex, New Haven, New London |
| Delaware | Sussex |
| Maine | Androscoggin, Cumberland, Hancock, Knox, Lincoln, Sagadahoc, Waldo, Washington, York |
| Maryland | Calvert, Charles, Dorchester, St. Mary's, Somerset, Wicomico, Worcester |
| Massachusetts | Barnstable, Bristol, Dukes, Nantucket, Norfolk, Plymouth, Suffolk |
| New Hampshire | Rockingham, Strafford |
| New Jersey | Atlantic, Bergen, Cape May, Cumberland, Essex, Hudson, Middlesex, Monmouth, Ocean, Union |
| New York | Bronx, Kings, Nassau, New York, Queens, Richmond, Suffolk, Westchester |
| Rhode Island | Bristol, Kent, Newport, Providence and Washington, Block Island |
| Virginia | Accomack, Charles City, Gloucester, Isle of Wight, James City, Lancaster, Mathews, Middlesex, New Kent, Northampton, Northumberland, Surry, and York, and the independent cities of Chesapeake, Hampton, Newport News, Norfolk, Poquoson, Portsmouth, Prince George, Suffolk, Sussex, Virginia Beach, Williamsburg |

**ENDORSEMENT #1**

This endorsement, effective 12:01 a.m., April 1, 2023 forms a part of

Policy No. US00128761PR23A   issued to Tradebe Environmental Services, LLC

by Indian Harbor Insurance Company

**TERRORISM ENDORSEMENT – EXCLUSION OF CERTIFIED ACTS OF TERRORISM**

This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY INSURANCE POLICY**

This Policy is amended as follows:

A.      This Policy does not cover loss or damage caused directly or indirectly by a "certified act of terrorism". Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

B.      "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1.      The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.      The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

C.      Exception Covering Certain Fire Losses

The following exception to the exclusion in Paragraph A. applies only in jurisdictions subject to the Standard Fire Policy.

If a "certified act of terrorism" results in fire, the Company will pay for the loss or damage caused by that fire. Such coverage for fire applies only to direct loss or damage by fire to Insured Property. Therefore, for example, the coverage does not apply to insurance provided under **TIME ELEMENT** or endorsements which apply to **TIME ELEMENT**.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the Company has met the insurer deductible under the Terrorism Risk Insurance Act, the Company shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

D.      Application of Exclusions

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War and Military Action Exclusion.

All other terms and conditions of this Policy remain unchanged.

_____
Signature of Authorized Representative

## ENDORSEMENT #02

This endorsement, effective 12:01 a.m., April 1, 2023 forms a part of

Policy No. US00128761PR23A issued to Tradebe Environmental Services, LLC

by Indian Harbor Insurance Company.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

### PARTICIPATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY INSURANCE POLICY**

This Policy is amended as follows:

1.    **Company as Participating Insurer**

In the event the Company participates with other insurers in one or more layers excess of the deductible, the maximum amount the Company shall pay per "occurrence" is limited to the Company's share of each successive layer shown in the chart below. This amount is further limited by any applicable sublimits stated in the **POLICY DECLARATIONS, G**. 2. **SUBLIMITS**, or in any applicable endorsement made part of this Policy.

| Layer Excess of Deductibles | Layer Limit per "occurrence" | | Company Share | Company Capacity |
|---|---|---|---|---|
| **Primary** | $25,000,000 | | 60% | $15,000,000 |
| | | | **Total:** | $15,000,000 |

2.    **Premium**

The premium is payable at policy inception and is inclusive of any premium shown on this endorsement. Subsequent additions to Property Insured and the corresponding insured values are subject to additional premium as provided in this Policy. This premium:

a.    does not include surcharges or fees (if any) as listed in the **COMMERCIAL PROPERTY INSURANCE POLICY DECLARATIONS.**

b.    does not include premium or applicable surcharges or fees (if any) shown on any endorsements attached to this Policy after inception.

| Layer Excess of Deductibles | 100% Net Pro Rata Program Premium | Company Share | Net Pro Rata Premium Due Company at Inception |
|---|---|---|---|
| **Primary** | $475,457 | 60% | $285,274 |
| **TRIA** | | | Excluded |
| **Total** | | | $285,274 |

3.  **Application**

    Except where an Aggregate is stated in the **POLICY DECLARATIONS, G**. 2. **SUBLIMITS**, or in any endorsement made part of this Policy, the Company's payment for one "occurrence" shall not reduce the applicable limit or sublimit available for another separate "occurrence".

    Except as expressly stated in the **POLICY DECLARATIONS, G. 2. SUBLIMITS**, or in any endorsement made part of this Policy, any applicable sublimits apply beginning with the lowest layer excess of the deductible and from the ground up apply successively through the layer(s) up to the sublimited amount. All sublimits represent the one hundred percent (100%) amounts which shall be restricted by application of the **Company as Participating Insurer** provision described above. Any part of a sublimit so retained by the Insured or so attributed to a layer of insurance fully exhausts that part of the sublimit for all purposes concerning the "occurrence".

4.  **Maintenance of Underlying Policies**

    If this Policy is placed excess of a primary insurance policy with a narrower scope of insurance, this Policy shall still provide insurance as written, provided that the Insured shall account in full for the amount of the primary limit and the limit or sublimits provided by the Company shall be reduced by that amount.

    Any primary or other underlying policy in force at the inception of this Policy will be maintained by the Insured during the Policy Term, and any renewals or replacements of such policies will not be more restrictive than the insurance provided by the current Policy.

    Under no circumstance shall the Company drop down or step down to become primary or underlying insurance, and the Company shall always be excess in any "occurrence" of the amounts shown in the **POLICY DECLARATIONS** for deductible(s), and any primary or other underlying insurance. Where there is an underlying aggregate limit, the Company shall pay only where the records presented establish to its satisfaction that the full underlying limit has been properly exhausted by insurance payments for covered Occurrences during the Policy Term.

5.  **Underlying Insurance**

    The Insured may purchase insurance on all or any part of the deductibles of this Policy, and the existence of such underlying insurance shall not prejudice any recovery otherwise payable under this Policy. The existence or absence of such underlying insurance shall not in any way reduce the Company's right to deduct from any covered claim the full amount(s) of the deductibles as shown in the **POLICY DECLARATIONS**. If the limits of such underlying insurance exceed the deductible which would apply under this Policy, then the insurance provided by this Policy shall apply only as excess after payment of that portion which exceeds such deductible has been exhausted.

All other terms and conditions of this Policy remain unchanged.

_____
Signature of Authorized Representative

**ENDORSEMENT #03**

This endorsement, effective 12:01 a.m., April 1, 2023 forms a part of

Policy No. US00128761PR23A issued to Tradebe Environmental Services, LLC

by Indian Harbor Insurance Company.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**INDIANA AMENDATORY ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY INSURANCE POLICY**

This Policy is amended as follows:

I.    **SECTION V. LOSS ADJUSTMENT AND SETTLEMENT,** paragraph **B. LOSS CONDITIONS**, item 6 is replaced by the following:

6.    **CHOICE OF LAW**

This Policy is governed by the laws of the State of Indiana. Any disputes arising hereunder will be exclusively subject to the law of the State of Indiana unless another state is mutually agreed upon by the Company and the Insured.

II.   **SECTION VI. GENERAL CONDITIONS**, paragraph **C. CANCELLATION AND NON-RENEWAL** is replaced by the following:

C.    **CANCELLATION AND NON-RENEWAL**

1.    **CANCELLATION**

a.    This Policy may be cancelled at any time at the request of the first Named Insured by surrendering this Policy to the Company or by giving written notice to the Company stating when such cancellation will take effect.

b.    If this Policy has been in effect for ninety (90) days or less, this Policy may be cancelled by the Company by giving the first Named Insured written notice of cancellation at least:

(1)    ten (10) days before the effective date of cancellation if the Named Insured fails to remit, when due, payment of premium for this Policy; or

(2)    twenty (20) days before the effective date of cancellation if the Named Insured has perpetrated a fraud or material misrepresentation on the Company; or

(3)    ninety (90) days before the effective date of cancellation if the Company cancels for any other reason.

c.    If this Policy has been in effect for more than ninety (90) days, or is a renewal of a Policy the Company issued, the Company may cancel this Policy, only for one or more of the reasons listed below, by giving the first Named Insured written notice of cancellation at least:

     (1)       ten (10) days before the effective date of cancellation if the Company cancels for nonpayment of premium;

     (2)       twenty (20) days before the effective date of cancellation if the Named Insured has perpetrated a fraud or material misrepresentation on the Company; or

     (3)       forty-five (45) days before the effective date of cancellation if:

          (i)       there has been a substantial change in the scale of risk covered by this Policy;

          (ii)      reinsurance of the risk associated with this Policy has been cancelled; or

          (iii)     the Named Insured has failed to comply with reasonable safety recommendations.

2.      **NON-RENEWAL**

This Policy may be non-renewed by the Company by giving the first Named Insured written notice of non-renewal at least ninety (90) days before the end of the policy period.

All other terms and conditions of this Policy remain unchanged.

_____

Signature of Authorized Representative

**ENDORSEMENT # 04**

This endorsement, effective 12:01 a.m., April 1, 2023 forms a part of

Policy No. US00128761PR23A issued to Tradebe Environmental Services, LLC

by Indian Harbor Insurance Company.

**SERVICE OF PROCESS**

The Commissioner of Insurance of the State of Indiana is hereby designated the true and lawful attorney of the Insurer upon whom may be served all lawful process in any action, suit or proceeding arising out of this Policy. The Insurer further designates:

> Sarah Mims
> General Counsel
> 505 Eagleview Boulevard, Suite 100
> Exton, PA 19341-1120

as its agent in Indiana to whom such process shall be forwarded by the Commissioner of Insurance.

For Illinois exposures, the Insurer further designates the Director of the Illinois Division of Insurance and his successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of an Illinois exposure and this contract of insurance.

All other terms and conditions of this Policy remain unchanged.

_____
Signature of Authorized Representative

XL-INSOP 0118

© 2018 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.